Vincent J. PROWELL, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 82S00–9803–PD–138.

Supreme Court of Indiana.

Jan. 11, 2001.

Susan K. Carpenter, Public Defender of Indiana, Barbara S. Blackman, Laura L. Volk, Steven H. Schutte, Deputy Public Defenders, Attorneys for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Thomas D. Perkins, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## ON PETITION FOR POSTCONVICTION RELIEF

BOEHM, Justice.

Vincent Prowell pleaded guilty to the 1993 murders of Denise Powers and Chris Fillbright and was sentenced to death. Prowell appeals the denial of his petition for postconviction relief and raises seven issues, which we restate as three: (1) Prowell was not afforded full and fair postconviction proceedings; (2) trial counsel was ineffective; and (3) Prowell's death sentence is cruel and unusual punishment in violation of the constitutions of Indiana and the United States.

We conclude that Prowell received ineffective assistance of counsel at both the guilt and penalty phases and that the postconviction court's findings to the contrary are clearly erroneous. We therefore reverse the denial of postconviction relief and remand with instructions to vacate Prowell's guilty plea, rescind his death sentence, and order a new trial.

### Factual and Procedural Background

In November 1992, twenty-eight-year-old Vincent Prowell moved from Chicago to Evansville to live with his mother, Karen Johnson, and her boyfriend, Ed Cooper. Although Prowell had never seen or been treated by a mental health professional, those who spent time with him suspected that something was "seriously wrong" with Prowell. A number of people heard Prowell engage in conversations with himself while alone in his bedroom, talk to the television set when it was turned off, respond to questions with odd or indirect answers, drift off on incomprehensible conversational tangents, and appear fearful of and threatened by others.[1]

---

1. Several witnesses testified at the postconviction hearing to Prowell's delusions and paranoia. For example, Karen Johnson, Prowell's mother, testified at the postconviction relief hearing that Prowell was once convinced that his grandmother, with whom he had a strong and loving relationship, had poisoned his orange juice. "He had his brother take him to have his stomach pumped out," she testified. "He just went berserk on [his grandmother], accusing her of poisoning him." After that incident, Karen suggested to her son that he talk to a psychiatrist, but Prowell became "very, very angry" and refused. Because he was an adult and had never committed a violent act, Karen was advised that she could not force him to seek treatment without his consent. Derek Reed, a childhood friend of Prowell's, testified that, on one occasion, when Reed rode in a car driven by Prowell on Lake Shore Drive in Chicago, Prowell suddenly "jerk[ed] his brakes on the highway" and exclaimed, "Didn't you see that elephant?" Toni Johnson, the domestic partner of Prowell's mother during his childhood, also testified that Prowell saw elephants on the expressway. Once, while swerving to miss an elephant, Prowell wrecked her car. Toni also stated that Prowell lost a job at a downtown Chicago hotel because he saw several white people exit a car and "he ran to hide because he thought they wanted to kill him." Neither Reed nor Toni was interviewed by Prowell's counsel until the postconviction relief stage.

In April 1993, Johnson and Cooper were arrested on drug charges, convicted, and sentenced to prison terms. Prowell, who was unusually dependent on his mother and had never before lived alone, moved into an apartment that Cooper had rented for him. Prowell's next door neighbor in the apartment complex was Powers.

On May 23, 1993, Powers sat in her automobile waiting for Fillbright. As Fillbright approached the driver's side door, Prowell shot him at close range in the back of the head. Prowell then shot Powers twice through the car window, piercing her lung and heart. An eyewitness identified Prowell as the shooter. *Prowell v. State*, 687 N.E.2d 563, 564 (Ind.1997)

A few hours later, Prowell was apprehended by police in Benton County, Indiana and confessed to both murders. Prowell also claimed that earlier that evening he had run into Fillbright, whom he had never met before, near the apartment complex's mailboxes. He told police that Fillbright had been hostile towards him for no reason, "acting all kinds of crazy" towards Prowell, with a "military look in his eye," and slinging racial slurs and "insinuation." In his confession, Prowell told police that he felt "threatened" by Fillbright and responded by getting his gun from his apartment and confronting Fillbright in the parking lot. Neighbor Joann Rose testified that Prowell approached Fillbright, shot him once from behind without any exchange of words, and then "pivoted" around to shoot twice through the passenger window.

One week after the murders, salaried, part-time public defenders Dennis Vowels and Michael Danks were appointed to represent Prowell, and a few weeks later, the

State filed notice of its intent to seek the death penalty. In mid-July 1993, trial was set for January 31, 1994, with jury selection to begin on January 27. On December 22, 1993, six weeks before the trial was scheduled to begin, Vowels attempted to obtain a plea bargain in exchange for two consecutive sixty-year terms. The prosecutor refused the offer. On January 14, 1994, Prowell pleaded guilty, without a plea agreement, to the murders of Powers and Fillbright. The court accepted the plea and set sentencing for March 3, 1994.

A week after the plea hearing, Vowels for the first time hired mitigation investigator Steve Brock. On the recommendation of Brock and Paula Sites of the Indiana Public Defender Council, Vowels asked for a continuance on February 22, 1994, to permit Brock to conduct a mitigation investigation. The court postponed sentencing for six weeks to April 20, 1994. On March 30, 1994, a full five weeks after obtaining the continuance, Vowels met for the first time with psychologist Dr. Joel Dill and asked him to evaluate Prowell.

At the sentencing hearing, Dill testified that Prowell suffered from paranoid personality disorder, a relatively minor mental disorder in comparison to more severe forms of paranoia.[2] Several family members and the jail chaplain also testified on Prowell's behalf. The trial court found that Prowell did not commit the murders under extreme mental disease or defect and sentenced him to death. The court stated that it:

> has been at a loss to find even a hint of a reason as to why the Defendant would commit what is no less than a double assassination or execution. The explanation given in one of Defendant's state-

2. According to the *The New Harvard Guide to Psychiatry*:

The essential feature of paranoid personality disorder is a pervasive and unwarranted suspiciousness and mistrust of people. These attitudes are intense and strongly defended. Patients search for evidence of deception, threat, or malevolence in others and are extremely sensitive and resistant to

any suggestion of their own guilt or responsibility.... This disorder is usually a stable and syntonic form of adaptation. Except for interpersonal difficulties with those in authority or those who attempt to become too close, paranoid individuals are likely to function stably.

*The New Harvard Guide to Psychiatry* 342 (Armand M. Nicholi ed., 1988).

ments indicates racial slurs were made by Mr. Filbright to the Defendant. I have trouble with this explanation for two reasons. One, words no matter how hateful do not justify murder, and two, evidence adduced at the Sentencing Hearing showed through pictures that Mr. Filbright was serving as an Army Officer in Operation Desert Storm, and had many Afro–American friends in the Service. Another statement revealed that the Defendant believed that Mr. Filbright was about to pull a gun. I do not believe this, as Mr. Filbright was shot in the back of the head execution style at close range. The Defendant also stated he believed Ms. Powers was attempting to pull something from her purse. All the physical evidence shows that Ms. Powers was shot in the back of the head, in the side of her face as she was attempting to get out of her car. The Defendant's explanation for shooting Ms. Powers is just not believable. There is no explanation for these atrocious and senseless acts. If we could discern a motive, maybe we could all better accept these tragedies.

On direct appeal, this Court affirmed the trial court's judgment and the imposition of the death sentence. *Prowell,* 687 N.E.2d at 570.

In postconviction proceedings, Prowell contended that his Sixth Amendment right to effective counsel was violated. His principal contention was that his guilty plea was entered before counsel had taken a number of essential steps to establish that, although Prowell undisputedly killed the two victims, the death penalty was inappropriate in view of Prowell's demonstrably severely impaired mental health. The postconviction court denied relief and this appeal ensued.

### Standard and Extent of Review

■ Prowell bore the burden of establishing the grounds for relief by a pre-

ponderance of the evidence. Ind. Post–Conviction Rule 1(5). Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues, Prowell must convince this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court. *Harrison v. State,* 707 N.E.2d 767, 773 (Ind. 1999) (citing *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995)). We will reverse only upon a showing of "clear error"—that which leaves us with a definite and firm conviction that a mistake has been made. *Spranger,* 650 N.E.2d at 1119.

### I. The Postconviction Court Findings

Prowell contends that a number of factual findings by the postconviction court were clearly erroneous. He notes that the "Findings of Fact, Conclusions of Law and Judgment on Petition for Post–Conviction Relief" issued by the postconviction court on July 7, 1999, are a virtually verbatim copy of the findings proposed by the State on June 21, 1999.[3] The conclusions of law were also as the State proposed, except for the deletion of a conclusion that Prowell had waived various claims by failing to raise the issues on direct appeal. That conclusion was incorrect in light of the then-recent decision in *Woods v. State,* 701 N.E.2d 1208, 1210 (Ind.1998) (holding that a Sixth Amendment claim of ineffective assistance of trial counsel may be presented for the first time in a petition for postconviction relief).

■ It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal rea-

---

3. The postconviction court made only trivial changes to the State's proposed findings of fact. Two sentences were moved to different places in the document and an error in addition was corrected.

soning. We recognize that the need to keep the docket moving is properly a high priority of our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings. But when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court. This is particularly true when the issues in the case turn less on the credibility of witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony. For the reasons explained below, most of the statements in the findings of fact and conclusions of law are correct if viewed in isolation, but many are presented out of context and, as a result, are significantly misleading. We find some of the critical findings of the postconviction court to be clearly erroneous as that term is used in Trial Rule 52(A).

## A. The Postconviction Testimony

In preparation for the postconviction relief hearing, Prowell was examined by Dr. Thomas Liffick, a psychiatrist and Medical Director of the Southwestern Indiana Mental Health Center in Evansville, and Dr. Rahn Bailey, a psychiatrist and Director of the Division of Law and Psychiatry at the University of Texas. Based on clinical interviews, collateral source information, and social history records, both Liffick and Bailey diagnosed Prowell as presently suffering, and suffering at the time of the murders, from chronic schizophrenia.[4] At the postconviction relief hearing, Bailey testified that the murders were "highly likely to be directly related to the significant influence of the most severe

symptoms [of schizophrenia]," including paranoia, hallucinations, delusional thought, and cognitive disorganization, and that the nexus between the homicides and Prowell's state of mind met Indiana's statutory criteria for mitigation.[5] When Liffick asked Prowell if he knew the victims, Prowell replied:

> He thought I was somebody come to visit her; they knew about my mother; everybody knew about it. Everything that goes on is tax free. He let me know he knew who I was. I wasn't the right element by saying two or three words. A lot of things in the system won't be changed. Deformity does exist. There's a lot of scientific crap in it. It was a mental confrontation. I would say insinuation, but I can't really.

Liffick agreed with Bailey that it was highly likely that Prowell acted under paranoid delusions at the time of the shootings. Despite their testimony, the postconviction relief court found that Prowell's claims were "without merit" and denied his petition for postconviction relief.

## B. The Findings of Fact

Referring to Bailey's testimony, the findings of fact state: "[W]hile Dr. Dill diagnosed Petitioner as suffering from paranoid personality disorder with schizoid tendencies at sentencing, that diagnosis was the least restrictive, therefore a reasonable diagnosis under the circumstances." Although this sentence may be literally correct, a review of Bailey's testimony on this point makes it clear that it is quite misleading. Bailey testified that there are three possible paranoid diagnoses. The mildest of the three is

---

**4.** Bailey diagnosed Prowell as suffering from paranoid schizophrenia, while Liffick found that Prowell suffers from undifferentiated schizophrenia.

**5.** Bailey testified that he believed that Prowell suffered from a "mental disease or defect" as defined in Indiana Code section 35–41–3–6:
(a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was

unable to appreciate the wrongfulness of the conduct at the time of the offense.
(b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

paranoid personality disorder. Paranoid delusional disorder is more severe and paranoid schizophrenia is the most severe of the three diagnoses. The major difference among the three diagnoses is the duration of the characteristic symptoms. Psychiatrists and psychologists are trained, Bailey testified, to "always give the diagnosis of least intensity when there are varying diagnoses that are all consistent." "By definition," Bailey testified,

> you cannot diagnose schizophrenia if the person has not had symptoms for six months or greater. So, no matter how sick they look when you see them, if you don't have access to records ... that show that he exhibited those kinds of symptoms more than six months ago, you know, you are precluded, based on our training, from diagnosing schizophrenia.

Because of the paucity of information provided to Dill before the sentencing hearing, specifically records and access to Prowell's family and friends who could establish the duration of Prowell's symptoms, Bailey testified that Dill could not have reasonably diagnosed paranoid schizophrenia at that time. It was the "circumstances" that made Dill's diagnosis "reasonable under the circumstances." This is a complicated way of saying that Prowell's counsel did not supply Dill with the readily-obtainable facts to establish the duration of Prowell's illness. The failure of Prowell's lawyers to provide their single mental health expert with the depth and volume of information necessary for a correct diagnosis is at the root of Prowell's claim of ineffective assistance of counsel.

The findings as to Bailey's testimony regarding Dill's original diagnosis of paranoid personality disorder and Bailey's own diagnosis of paranoid schizophrenia are equally flawed. The findings of fact state that, according to Bailey, "[t]he two diagnoses are very similar." Again, Bailey did make this statement, but, taken out of context, it stands Bailey's testimony on its

head. The finding is predicated on the following exchange, which occurred during the State's cross-examination of Bailey:

Q. Would you characterize the paranoid personality disorder in contrast to paranoid schizophrenia, are those two diagnoses more similar or more different from each other?

A. I think they are very similar. They are two of the only three paranoid diagnoses in the textbook when you have paranoia, you can follow up under this diagnostic category. The big issue is intensity.

Bailey went on to explain that, although both diagnoses share the symptom of paranoia, the difference in intensity is important because it indicates how significantly a person's functionality and thought processes are affected. On re-direct:

Q. Would you tell us again whether there is a difference between a thought disorder and a personality disorder and if so, what?

A. There is a tremendous difference. Axis I disorders are a big, heavy, primary stuff that you see in psychiatry, so, schizophrenia, schizoaffective disorders, major depression, and bi-polar disorder, anxiety. Those are the big guys.... Those are psychiatric patients. Personality disorders are considered very minor in my field.... If you spend this kind of time with somebody, read all of his records, talk to all of his collateral sources and then you say personality disorder versus schizophrenia, that is big. You are not splitting hairs. That is a big, again, monumental difference.

The findings of fact also mischaracterize Dill's testimony. Although Dill did testify that "he considered both paranoid personality disorder and paranoid schizophrenia before making his diagnosis," he also testified that he had to reject paranoid schizophrenia because Prowell did not admit to delusions or hallucinations. The findings

of fact state that "[i]t was Petitioner's failure to admit to hallucinations that partially prevented Dr. Dill from diagnosing Petitioner with paranoid schizophrenia." This is reasoning straight out of *Catch–22*. Just as Yossarian's insane determination to stop flying on bombing raids proved his sanity, the State contends that if Prowell suffers from a disorder that causes him to deny its symptoms, he must be sane.

The expert testimony cited in support of this view in fact rejects it. The thrust of Dill's testimony is that a competent professional armed with available facts would penetrate Prowell's denials. Dill testified that in his three short interviews with Prowell, he found him to be "guarded" and unwilling to share much information, a characteristic to be expected of persons suffering from paranoid schizophrenia. He also testified that he would have preferred to interview Prowell for an extended period of time in a clinical setting where he could have built trust with Prowell and conducted various tests. That option was unavailable to him because he was hired by Prowell's counsel on March 30, 1994, and he interviewed Prowell on April 11, 16, and 17, 1994. The last interview was just three days before Dill testified at Prowell's April 20 sentencing hearing. Nor did Prowell's counsel present Dill with any information from collateral sources about Prowell's longstanding delusions or hallucinations.

The findings of fact state that "Dr. Liffick noted that each of the mental health professionals at the post conviction hearing had diagnosed Petitioner slightly differently and compared it to arguing about a shade of a particular color." This is clearly erroneous to the extent that it implies that Liffick was comparing his own diagnosis of undifferentiated schizophrenia with both Bailey's diagnosis of paranoid schizo-

phrenia and Dill's earlier diagnosis of paranoid personality disorder. In fact, Liffick testified only that there was very little difference in a clinical sense between Bailey's diagnosis (paranoid schizophrenia) and his own (undifferentiated schizophrenia). When questioned about the distinction between Dill's diagnosis of paranoid personality disorder, given to the trial court, and the postconviction diagnoses of schizophrenia, Liffick replied:

> There is a much more significant difference between paranoid personality disorder and schizophrenia than there is between any of the subtypes of schizophrenia, so to say that, at that time, he had a paranoid personality disorder was a misdiagnosis. It actually put him in the wrong category of illness to a very significant degree. The differences I've already said between paranoid schizophrenia and undifferentiated schizophrenia is miniscule in comparison.

■ The postconviction court found that "[c]ounsel sought to employ a mental health expert sufficiently in advance of the sentencing hearing."[6] In fact, Dill testified, and the billing records from Vowels confirm, that he was first contacted by Prowell's lawyers on March 30, 1994, three weeks after the date of the original sentencing hearing and three weeks before the postponed sentencing hearing. Due to these time constraints, Dill was unable to interview Prowell under normal conditions or at any length. Nor could he establish a relationship necessary to elicit information or collect the full range of records and information from collateral sources necessary for a proper diagnosis. The finding that Dill was employed "sufficiently in advance of the sentencing hearing" is clearly erroneous in light of the evidence presented to the postconviction court.

---

6. Although characterized by the postconviction court as a conclusion of law, this is actually a finding of fact and is reviewed as such. We accept the postconviction court's findings of fact unless "clearly erroneous," Ind. Trial Rule 52(A), but no deference is accorded conclusions of law. *State v. Van Cleave,* 674 N.E.2d 1293, 1295–96 (Ind.1996). The label the trial court applies to a "finding" or "conclusion" is not determinative. *Id.* at 1296.

The findings of fact make no reference to the postconviction court's assessment of the credibility of Dill, Bailey, or Liffick. It is quite clear from the testimony of all three doctors that paranoid or undifferentiated schizophrenia is substantially different from paranoid personality disorder. In light of this fact, the postconviction court's finding that the evidence presented to the postconviction court was simply "more of the same" as that presented to the sentencing court is clearly erroneous.

■ The postconviction court's findings and conclusions also stated that:

> While Petitioner now offers additional (and some of the same) family members and expert witnesses, the substance of their testimony is simply more of the same evidence presented at the sentencing hearing. Save the mere quantity of the witnesses, trial counsel put on substantially the same mitigation case developed and presented by postconviction counsel more than five years after the sentencing hearing. That is to say, trial counsel developed the very contours of the mitigation theory and defense presented by postconviction counsel who was proceeding with the advantage of hindsight and an additional five years time. It cannot be the law that trial counsel will be said to have performed at sentencing in an objectively unreasonable manner whenever subsequent counsel can, with unlimited time and resources, heap on additional or even better evidence to support the mitigation theory.... Counsel were not ineffective for relying on the diagnosis at trial which was substantially the same as the evidence presented at the postconviction hearing.

Prowell first points out that this paragraph is nearly identical to language in the State's reply brief in *State v. Holmes*, 728 N.E.2d 164 (Ind.2000), and to the postconviction relief court's findings of fact and conclusions of law in *Wrinkles v. State*, 690 N.E.2d 1156 (Ind.1997). Although we sympathize with the usefulness of recycling language, it is not appropriate to use form language where those statements are not an accurate reflection of the testimony and evidence. That is the case here. As already noted, the statement that the evidence presented to the postconviction relief court was simply "more of the same" as that presented to the sentencing court is clearly erroneous. Both Bailey and Liffick testified, in depth, as to the "monumental" and "very significant" differences between a diagnosis of paranoid personality disorder and a diagnosis of schizophrenia. Nor can it be said that the evidence was produced "with the advantage of hindsight and an additional five years time." Vowels continued to represent Prowell in his direct appeal to this Court and the ineffectiveness of trial counsel at the guilt and sentencing phases was not an issue in that direct appeal, which concluded when rehearing was denied on March 2, 1998. The counsel who represented Prowell in postconviction proceedings entered their appearances on March 31 and October 13, 1998, and the postconviction hearing took place on April 19, 1999. Counsel did not have an "additional five years" to investigate this case, let alone "unlimited time."

## II. Ineffective Assistance of Counsel

Prowell's primary claims in this appeal are ineffective assistance of trial counsel at the guilt and sentencing phases of his case. For the most part, the claimed shortcomings in counsel's performance bear on both, because they relate to the failure to present the severity of Prowell's mental health, which related to any insanity defense, to the plea of guilty but mentally ill, and to the appropriateness of the death penalty.

■ To establish a violation of the Sixth Amendment right to effective assistance of counsel, the defendant must show that (1) counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's errors, the result of the pro-

ceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Prowell argues that his trial counsel were ineffective at the guilt phase on four grounds: (1) inadequate factual mitigation investigation; (2) inadequate development of expert testimony; (3) failure to form and execute a reasonable trial strategy; and (4) violations of Criminal Rule 24. For these purposes, the issue is not whether testimony similar to Liffick's and Bailey's, along with the background witnesses', would carry the day. It is sufficient that there is a reasonable probability that this is the case, and we have no doubt that this showing was easily made.

### A. Counsel's Awareness of Potential Mental Health Issues

Vowels had previously served as second chair in the defense of Timothy Anderson, who was charged with murder and tried in Judge Young's court. After Anderson was convicted on a plea of guilty but mentally ill, the jury recommended death. Judge Young instead imposed a term of sixty years, stating that "the jury's verdict of guilty but mentally ill is inconsistent with the death sentence." Based on this experience, Vowels formulated a "strategy" to rely on Judge Young's presumed reluctance to sentence a mentally ill person to death.

In the Anderson case, Judge Young stated that he was persuaded by compelling evidence, including the testimony of a number of psychiatrists who relied on their own evaluations and a detailed background report, that the defendant had long suffered from a severe mental illness.[7] At Prowell's sentencing, Judge Young denied any parallels to the Anderson case: "I rejected the death penalty recommenda-

tion from the Jury on that case because I personally do not believe that we should execute mentally ill individuals. That case and the case of Mr. Prowell do not have any similarities other than death of a victim."

Prowell first claims that his trial counsel were ineffective because they failed to conduct a reasonable mitigation investigation. Specifically, he argues that despite their suspicions that Prowell suffered from mental illness, Vowels and Danks failed to investigate adequately his mental health with the goal of a defense of insanity or a plea of guilty but mentally ill. Both Vowels and Danks testified at the postconviction relief hearing that from the outset of their representation, they believed Prowell to be "mentally unsound" or "mentally ill." For example, Vowels testified that his first impression of Prowell was that "[s]omebody's home, but the lights aren't on." He also described the experience of attempting a conversation with Prowell as "pulling teeth."

> You may ask Mr. Prowell, "How are you today?" and his visual ... I mean, what you take in, I say, "How are you today?" and the look he gives you is that you have just asked him to reveal Einstein's Formula of Relativity. I mean, it's like it's a very complex thing for him to respond to you.

Similarly, Danks testified that Prowell was "withdrawn" and "distant," didn't appear to understand "the gravity of the situation," and didn't "under[stand] reality in a normal sense." Although Vowels believed Prowell to be mentally ill, he did not consider recommending pleading guilty but mentally ill, which is one of the three pleas appropriate in Indiana criminal proceedings. Ind.Code § 35–35–2–1(a)(3) (1998);

7. In the Anderson case, Judge Young found: ... that the defendant has a significant history of mental illness and that over the years, he has voluntarily admitted himself to various hospitals for treatment. I further find that there is no conflict in the evidence as to the defendant's mental ill-

ness. He was born with this mental illness which first manifested itself during his twenties and continues to the present time. It is not concocted or faked and there is no doubt that the defendant is severely mentally ill.

*Miller v. State*, 720 N.E.2d 696, 702 (Ind. 1999).

■ Despite his experience with the Anderson case and his belief that Prowell was mentally ill, Vowels did not take similar steps to investigate Prowell's background and family history to supply his expert with the necessary information to form a proper diagnosis. A lawyer experienced in capital representation, the mitigation investigator, and two psychiatrists all testified at the postconviction hearing that the information gathered by Prowell's trial counsel and provided to Dill before the sentencing hearing was inadequate and below prevailing norms in capital cases. It is clear from the record that Dill's conclusion that Prowell suffered from paranoid personality disorder, described by both psychiatrists as a far less serious mental illness than schizophrenia, was an inevitable result of the scanty information supplied to him and the fact that he was retained just eighteen days before Prowell's sentencing hearing. Essentially, Vowels allowed Prowell simply to fall on the mercy of the trial court without developing the evidence necessary to support a diagnosis of serious mental illness. This step is certainly not necessary to effective counsel in every case. Here, however, there were obvious indications that Prowell's case did present substantial issues turning on the development of this evidence.

### B. *Failure to Develop Expert Testimony*

■ Despite their suspicions that Prowell suffered from severe mental illness and their decision to rely on the judge's reluctance to sentence a mentally ill person to death, Vowels and Danks did not retain Dill until ten months after they were appointed to represent Prowell and two-and-a-half months after the guilty plea. Nor did they hire mitigation investigator Steve Brock until a week after Prowell had pleaded guilty. Vowels, who had previously served as second chair in the defense of Anderson, a death-penalty-eligi-

ble defendant who pleaded guilty but mentally ill, had experience with gathering evidence of mental health mitigators, but did not attempt do so until after Prowell's plea. Without the assistance of a psychologist or psychiatrist and a mitigation investigator, Prowell's trial counsel did not have the basic information necessary to advise Prowell as to a plea of guilty but mentally ill, nor did they have the ability to argue persuasively for a plea agreement on that basis.

The fact that Vowels waited until after Prowell had pleaded guilty to retain a mental health expert is in itself troubling. But concern is heightened by the haphazard way Vowels went about hiring that expert. The same Liffick who examined Prowell before his postconviction relief hearing and diagnosed him as suffering from schizophrenia was a psychiatric witness in the Anderson case. Despite Vowels' prior experience with Liffick, who was the Medical Director of the Southwestern Indiana Mental Health Center in Evansville and an expert in schizophrenia, when Vowels finally did produce an expert to testify at Prowell's sentencing, he relied on the recommendation of a new lawyer who knew Dill only through Dill's testimony in Social Security disability benefits hearings.

Finally, Liffick, Bailey, and Dill all agreed in postconviction testimony that when Dill was eventually retained, he was not given enough time or adequate information to diagnose Prowell properly. Dill did not have the time to establish a relationship with Prowell that would enable him to gain useful information. Bailey testified that without records or other evidence that a patient's symptoms had lasted longer than six months, no doctor could, in good conscience, arrive at a diagnosis of schizophrenia. In simple terms, Prowell's under-diagnosis as suffering from paranoid personality disorder was a direct result of his counsel's failure to retain a mental health expert in a timely manner and their failure to provide the sole expert with essential information.

### C. *Failure to Form and Execute a Reasonable Trial Strategy*

 Vowels trial strategy was, in his words: "to rely on the good graces of the Circuit Court judge not to put my client on death row." But as Judge Young's comments at Prowell's sentencing make clear, Vowels failed to convey to the court the severity of Prowell's mental illness and connect it to the murders. This failure to investigate adequately Prowell's mental status and secure appropriate expert testimony was compounded by the fact that, at the guilty plea hearing, Vowels affirmatively represented Prowell to be mentally sound at that time and at the time of the murders. These statements significantly undermined an already flimsy sentencing strategy.

Although Vowels and Danks had spent several hours preparing Prowell for the guilty plea hearing, Prowell had difficulty stating a factual basis for the plea that was acceptable to the court and prosecutor. In an attempt to remedy the situation, Vowels asked Prowell a few questions to establish that he "knowingly" committed the murders. Still unsatisfied that Prowell's statements adequately met the culpability requirement, the prosecutor admitted a transcript of Prowell's initial statement to police in order to establish a factual basis for the plea. Worried that the court would still not accept Prowell's plea, Vowels volunteered:

> Judge, I have no question Mr. Prowell understands this Hearing, understands what he's charged with, understands the proceedings, understands what he's waiving today. He is fully capable of assisting me, he is fully capable of discussing the case with me. He has reviewed the case file with me, he has intelligently discussed the facts of the case, he is lucid, he has a good attention level. My investigation, and I will candidly tell your Honor, at this point I am bound by a privilege, but I can tell you, and it is not my, let me say this, my investigation reveals that my client's

plea today is knowingly, voluntarily, and that he is of sound mind today and on the event of the murders.

This is an astonishing statement given that Prowell pleaded guilty without a plea agreement and that Vowels' sole sentencing strategy was to convince Judge Young that Prowell was severely mentally ill and therefore should not be sentenced to death. Vowels' statement to the court about Prowell's comprehension of the proceeding, his ability to assist in his own defense, and his "sound mind today and on the event of the murders" is fundamentally inconsistent with his attempt to argue that Prowell had long suffered from a serious mental illness which mitigated his culpability for the murders. Given the inconsistency of Vowels' statements to the court, the testimony of a psychologist that Prowell merely suffered from a personality disorder, and the paucity of mitigating evidence or testimony regarding Prowell's background, it is not surprising that Judge Young found that Prowell's case bore little resemblance to Anderson's. There is more than a reasonable probability that the decision of the trial court to sentence Prowell to death was a direct result of counsel's ineffectiveness.

Vowels' speech was apparently an effort by counsel to cause the court to accept the plea, but it at the same time disavowed Prowell's best hope to avoid the death penalty. It is not too harsh to state that it appears counsel's desperation to avoid a trial for which there was grossly inadequate preparation also drove Prowell's lawyers to jettison his best hope to survive.

### D. *Criminal Rule 24 Violations*

 Prowell offers an explanation for why his trial counsel failed to conduct an adequate mitigation investigation, retain experts who could provide the severe diagnosis that Liffick and Bailey found, or even take the time to create a reasonable strategy. Prowell points out that, throughout his representation, Vowels car-

ried a felony caseload far in excess of that permitted under Criminal Rule 24(B)(3). Indiana is unique among the states in its effort to prevent ineffective assistance of counsel in capital cases. Criminal Rule 24 provides that "appointed counsel shall not accept workloads which, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations." Salaried or contractual public defenders are to be appointed as trial counsel in capital cases only if:

(i) the public defender's caseload will not exceed twenty (20) open felony cases while the capital case is pending in the trial court;

(ii) no new cases will be assigned to the public defender within thirty (30) days of the trial setting in the capital case;

(iii) none of the public defender's cases will be set for trial within fifteen (15) days of the trial setting in the capital case; and

(iv) compensation is provided as specified in paragraph (C).

Although the point has never been made explicit, we think it is clear that unless any variances from the standards of the rule are disclosed to the court, acceptance of employment under the rule constitutes a representation to the trial court that counsel meets the requirements of the rule. Courts cannot be expected to police sua sponte the caseloads of the counsel appearing before them. It is incumbent upon defense counsel to raise any issue presented by counsel's workload in excess of the limits laid out in the rule. The rule is self-enforcing to the extent that the State may refuse to reimburse counties for attorney expenses if the requirements of Criminal Rule 24 are not met.

The most obvious remedy is found within the rule itself, that is, refusing to compensate a county for attorneys' fees and expenses where the defense attorney is found to be in violation of the caseload limits prescribed by the rule without the court's permission. Presumably, the county would then penalize the lawyer who violated the rule by withholding payment for time spent on cases where the rule was violated. Experience suggests that lawyers are likely to observe rules if their paychecks depend on it.

We note that Vowels may well have reasonably concluded that there was no need to raise the Criminal Rule 24 issues with the trial court because the trial court's appointments were themselves the source of these Criminal Rule 24 problems. In any event, the issue here is not the remedy for a Criminal Rule 24 violation. It is the effectiveness of Prowell's representation, whether it stemmed from that circumstance or others.

■ In this case, Vowels apparently made no effort to limit his caseload to comply with Criminal Rule 24 or to raise the issue with the court. Vowels was appointed to represent Prowell on May 31, 1993. On that day, he had twenty-eight open public defender felony cases. From May 31, 1993 through May 5, 1994, the day when Judge Young sentenced Prowell to death, Vowels' felony public defender caseload ranged from twenty-one to forty-three open felony cases. Prowell's original trial date was set for late January 1994. In the months of November and December 1993, when Vowels presumably should have focused his attention on Prowell's case, he had an average of thirty-eight open public defender felony cases, nearly twice the number allowed under Criminal Rule 24. Vowels is a salaried part-time public defender in Vanderburgh County. The number of additional private felony cases that he carried during his year-long representation of Prowell is unknown.

Vowels' caseload also violated subsection (B)(3)(c)(iii) of Rule 24, which specifies that none of the public defender's cases may be set for trial within fifteen days of the capital trial. Vowels was appointed to represent Raphael Hastie on a non-capital murder charge with trial set for February

7, 1994, approximately ten days after Prowell's trial was scheduled to begin. Vowels testified at Prowell's postconviction relief hearing that he believed that he had a good chance of securing an acquittal for Hastie and that he had spent a large number of hours in December 1993 and January 1994 preparing for the case.

Given the rigors of his high caseload, and particularly the demands of the Hastie case, Vowels testified that he was not prepared to take the Prowell case to trial on January 27, 1994. He testified that he took no steps to select a jury for the Prowell trial, was not prepared to question potential jurors in a death penalty case, was not prepared to present a defense in the guilt phase of the trial, and was not prepared to present a mitigation case. Vowels did not counsel Prowell to plead guilty to two death-penalty-eligible murders without a sentencing agreement based on a reasonable trial strategy. Instead, in his words, he did so because he "was afraid to try his case."

### E. Reasonable Probability of a Different Result

 Prowell's condition obviously raised significant issues as to an insanity defense, whether a guilty or guilty but mentally ill plea was appropriate, and the appropriate sentence. Counsel failed to develop mental health testimony and conducted only the most cursory investigation of Prowell's behavior and background before advising him to plead guilty. This performance of Prowell's trial counsel fell below an objective standard of reasonableness based on prevailing professional norms. The second prong of the *Strickland* test for ineffective assistance of counsel is whether there is a reasonable probability that the deficiencies in counsel's performance prejudiced the defen-

dant. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Prowell's claims that but for his counsel's ineffective assistance, he would not have pleaded guilty. In *State v. Van Cleave*, 674 N.E.2d 1293, 1296–97 (Ind.1996), this Court applied the *Strickland* standard to a claim of ineffective assistance of counsel where the defendant pleaded guilty. We held that in order to establish that a guilty plea would not have been entered if trial counsel had performed adequately, the petitioner must show that a defense was overlooked or impaired and that there was a reasonable probability of success at trial. *Van Cleave*, 674 N.E.2d at 1299–1300. *Van Cleave* dealt with a trial that could produce only two results, guilty or not guilty. A more precise formulation, relevant here, is that the petitioner must show a reasonable probability of a different result. Prowell's hypothetical trial could produce a result of either guilty, not guilty, or guilty but mentally ill. Thus, the question in this case is whether there was a reasonable probability a trial would have produced a result of either not guilty or guilty but mentally ill.

 Although the evidence that Prowell killed Powers and Fillbright is uncontroverted, the evidence at postconviction established a reasonable probability that a jury would have found Prowell guilty but mentally ill if an adequate defense had been presented. Although a guilty but mentally ill conviction or plea does not guarantee a defendant that the death penalty will not be imposed, *Harris v. State*, 499 N.E.2d 723, 725–27 (Ind. 1986), as a practical matter, defendants found to be guilty but mentally ill of death-penalty-eligible murders normally receive a term of years or life imprisonment.[8] *See*

---

**8.** Even James Allen Harris, the defendant in the case which established that the imposition of the death penalty for a defendant found to be guilty but mentally ill is constitutional, eventually had his death sentence vacated by a postconviction relief court. He was then resentenced to a term of sixty-years imprisonment. None of the current residents of Indiana's death row and none of those executed in Indiana since the death penalty was

*Dunlop v. State,* 724 N.E.2d 592, 596 (Ind. 2000) (sentenced to life imprisonment after jury verdict of guilty but mentally ill); *McIntyre v. State,* 717 N.E.2d 114, 119 (Ind.1999) (sentenced to life imprisonment after jury verdict of guilty but mentally ill); *Whipple v. State,* 523 N.E.2d 1363, 1365 (Ind.1988) (sentenced to term of years after a jury verdict of guilty but mentally ill). Prowell focuses on the statement by Judge Young in the Anderson case that the death penalty is inappropriate for a defendant found guilty but mentally ill. We believe the *Strickland* test is to be applied without regard to the propensities of an individual judge or jury. *See Hill v. Lockhart,* 474 U.S. 52, 60, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (citing *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052). Nevertheless, we believe Judge Young's view is shared by many and therefore the view he expressed meets the test of a reasonable probability as an objective matter.

■ There is a second aspect to counsel's deficient performance in this case. Here counsel advanced pleading guilty without having developed either expert opinion or background information that were highly relevant to an evaluation of Prowell's mental health which in turn was relevant in both the guilt and penalty phases. Postconviction hearing established that the prosecutor refused a guilty plea in exchange for two consecutive life sentences. It also established that Prowell's counsel never considered seeking a guilty but mentally ill plea agreement, with or without an agreement as to the penalty. Even with no agreement on penalty, such a plea agreement would most likely have averted the death penalty. There is a reasonable probability that failure to seek such an agreement, and the prosecutor's presumed rejection, are both attributable to failure to develop before the plea the

evidence that was presented to the postconviction court.

## III. "Manifestly Cruel and Unusual Punishment"

Finally, Prowell claims that the death penalty, as applied to defendants who suffer from severe mental illness, cannot be reconciled with the "evolving standards of decency" required by Article I, Section 16 of the Indiana Constitution and the Eighth Amendment to the United States Constitution. *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Because we have determined that Prowell's claim of ineffective assistance of counsel has merit and that he is entitled to postconviction relief on that ground, we need not address the question of whether the execution of the severely mentally ill is constitutional in Indiana.

## Conclusion

We conclude that Prowell received ineffective assistance of trial counsel at both the guilt and penalty phases. The denial of Prowell's petition for postconviction relief is reversed. The case is remanded with instructions to grant Prowell's petition to vacate his guilty plea and order a new trial.

SHEPARD, C.J., and DICKSON, SULLIVAN and RUCKER, JJ., concur.

reinstated in 1977 were found to be guilty but mentally ill either by a jury or through an

accepted plea.