## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 10 2015, 8:20 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the matter of the termination of the of the parent-child relationship of:

A.H. & B.H. (Minor Children)

And

G.H. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 10, 2015

Court of Appeals Case No.
48A02-1503-JT-156

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause No.
48C02-1409-JT-58 & 48C02-1409-JT-59

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, G.H. (Mother), appeals the trial court's Order terminating her parental rights to her minor children, B.H. and A.H. (collectively, Children).

We affirm.

## ISSUES

Mother raises two issues on appeal, which we restate as follows:

(1) Whether the trial court erred by adopting the Department of Child Services' (DCS) proposed findings verbatim; and

(2) Whether there was sufficient evidence to support the termination of Mother's parental rights.

## FACTS AND PROCEDURAL HISTORY

Mother and M.H. (Father)[1] are the biological parents of B.H., born June 30, 2005, and A.H., born July 16, 2008. On January 5, 2012, the DCS in Madison County, Indiana, received a report that Father was on the run because there was a warrant for his arrest. In light of that report, a law enforcement officer was sent to Mother's and Father's home to conduct a welfare check. When the

---

[1] On February 19, 2015, the trial court terminated Father's parental rights to the Children. Father is not a party to this appeal, although facts relating to him are included where appropriate.

officer arrived, he found Mother unresponsive, and there was an unidentified adult male taking drugs intravenously in the bathroom. Mother was transported to the St. Vincent Mercy Hospital in Elwood, Indiana. Because Father's whereabouts were unknown, the Children were released to Mother's sister, M.G., (Aunty).

[5] The following day, Family Case Manager Matthew DeLong (FCM DeLong) and a law enforcement officer of the Elwood Police Department went to visit Mother at the hospital. Mother claimed that she could not recall the events of the previous day but stated that she had intentionally overdosed with Zanex, Opana, and Morphine in an attempt to end her life. Mother claimed that she could not remember the Children being present at the time. On the same day, FCM DeLong spoke with Mother's relatives who explained that Mother suffered from depression, and that she had in the past attempted to commit suicide. Also, FCM DeLong interviewed the Children. The Children stated that they were present when the officer arrived at their home, and they were scared because Mother was unresponsive and had to go to the hospital. After the interview, FCM DeLong explained to the Children that they were going to stay with their maternal grandmother (Grandmother).

[6] On January 9, 2012, DCS filed separate petitions alleging that B.H. and A.H. were children in need of services (CHINS) based on Mother's attempt to commit suicide and the lack of a secondary care giver in the home to ensure the safety of the Children at the time. The next day, the trial court held a detention/initial hearing where it continued the Children's removal from

Mother's care. On January 25, 2012, both Mother and Father attended an additional initial hearing and subsequently admitted the allegations contained in the CHINS petitions. As a result, the trial court maintained placement of the Children with Grandmother.[2]

[7] On February 15, 2012, the trial court held a dispositional hearing at which Mother and Father were ordered to participate in counseling, visit the Children, enroll in programs recommended by DCS, keep all appointments, complete substance abuse assessment, submit to random drug screens, abstain from use of illegal drugs, and maintain consistent contact with DCS. On July 25, 2012, the trial court found both parents uncooperative with the Children's case plans. That they had not enhanced their ability to fulfil their parental obligations or alleviated the conditions leading to the Children's placement outside their home. The trial court then set the permanency hearing date for both Children on January 8, 2013. On January 30, 2013, the trial court issued a permanency review order finding that Mother and Father had displayed some progress; nonetheless, the order stated that parents had failed to attend a family team meeting that was intended to discuss the implementation of a reunification permanency plan for the Children. Based on that fact, the trial court continued placement of the Children with Grandmother and set a joint periodic review/permanency hearing for both Children on July 3, 2013.

---

[2] Around that time, FCM Christin Myers (FCM Myers) replaced FCM DeLong.

[8] On February 25, 2013, DCS filed motions for change of placement alleging that transferring the Children from their relative placement with Grandmother to foster care was necessary due to frequent moves, utilities being turned off, and that there were other people—who had not been cleared by DCS—living in Grandmother's home. On the same day, the trial court granted that motion. On July 3, 2013, the trial court found that Mother and Father were still not participating in the services and set a permanency hearing for B.H. on December 11, 2013, and for A.H. on January 15, 2014.

[9] On August 21, 2013, DCS filed separate termination petitions with respect to each child, and for the closure of its services. In the modification report dated August 26, 2013, it stated that the Children were progressing well in foster care. The report also stated that Mother had not complied with home-based services, and FCM Myers had been unable to schedule a family team meeting since Father had recently been incarcerated.

[10] On September 17, 2013, the trial court found that Mother had not made enough progress to be reunited with the Children, whereas Father had participated minimally since he was incarcerated. As such, the trial court granted DCS' request to terminate its services. The record shows that the termination petitions filed on August 21, 2013, were later dismissed on October 31, 2013, due to Mother's improved participation with the services, and that DCS intended to give Mother more time to complete the services.

[11] On December 11, 2013, the trial court found that Mother was participating in home-based services, counseling sessions, parental classes, substance abuse counseling, and was visiting with the Children. An additional report dated June 17, 2014, indicated that Mother was visiting with the Children and had completed a substance abuse treatment program. Despite Mother's progress, the report stated that Mother was not regularly meeting with her home-based case worker and that she needed to seek employment. As for Father, the report noted that his whereabouts were unknown after his release from prison, and he had failed to visit with the Children or participate in any of the services. Due to the parents' continued noncompliance, on September 26, 2014, DCS filed yet another petition seeking to terminate Mother's and Father's parental rights, and for the cessation of all its services. On December 10, 2014, the trial court changed the permanency plan from reunification to adoption.

[12] An evidentiary hearing was held on January 27, 2015. Mother was present with counsel; however, Father failed to appear in person, choosing to appear only by Mother's counsel. DCS' attorney, FCM Myers, and the Children's court-appointed special advocate (CASA) were also in attendance. FCM Myers stated that she was concerned since Mother could not remain sober for sustained periods as she had relapsed to using drugs during the pendency of the CHINS case. With regards to Father, FCM Myers testified that he had not completed any of the services offered by DCS, his sobriety was an issue, and so were his incarcerations. In addition, FCM Myers indicated that Father had not visited with the Children throughout the entire CHINS proceedings. As such,

FCM Myers recommended the termination of parental rights. The CASA also stated that she was concerned about Mother's sobriety, as well as Mother's potential pending incarceration since Mother had violated her probation for using non-prescribed drugs. Likewise, the CASA recommended that it would be in the Children's best interests to terminate parental rights. On February 19, 2015, adopting DCS' proposed findings of fact and conclusions of law, the trial court terminated Mother's and Father's parental rights.

Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

In reviewing the termination of a parent's rights, it is a long-settled tenet of this court that the trial court is entitled to considerable deference. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). Our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009), *reh'g denied*. Rather, we will consider only the evidence, and any inferences reasonably derived therefrom, most favorable to the trial court's judgment. *Id*. In addition, Indiana Code section 31-37-14-2 requires that a finding in a termination proceeding "be based upon clear and convincing evidence." Accordingly, in reviewing whether the trial court's findings or judgment are clearly erroneous, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and

convincingly support the judgment." *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).

## II. *Adoption of DCS' Proposed Findings of Fact*

[15] Mother first argues that the trial court's verbatim adoption of DCS' proposed findings was error. Trial Rule 52(C) encourages trial courts to request that parties submit proposed findings of fact and conclusions of law, and it is not uncommon or *per se* improper for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. *Clark v. Crowe*, 778 N.E.2d 835, 841 n.3 (Ind. Ct. App. 2002) (citing *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1249 (Ind. Ct. App. 2002), *trans. denied*). When a party prepares proposed findings, he or she "should take great care to insure that the findings are sufficient to form a proper factual basis for the ultimate conclusions of the trial court." *Marathon Oil Co. v. Collins*, 744 N.E.2d 474, 477 n.2 (Ind. Ct. App. 2001) (citing *Maloblocki v. Maloblocki*, 646 N.E.2d 358, 361 (Ind. Ct. App. 1995)). Moreover, "the trial court should remember that when it signs one party's findings, it is ultimately responsible for their correctness." *Id.* As noted by this court in *Clark*, we urge trial courts to scrutinize parties' submissions for mischaracterized testimony and legal argument rather than the findings of fact and conclusions of law as contemplated by the rule. 778 N.E.2d at 841 n.3.

[16] We encourage such scrutiny for good reason. As our supreme court has observed, the practice of accepting verbatim a party's proposed findings of fact "weakens our confidence as an appellate court that the findings are the result of

considered judgment by the trial court." *Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 273 n.1 (Ind. 2003) (citing *Prowell v. State*, 741 N.E.2d 704, 708-09 (Ind. 2001)). However, as the court also noted, verbatim reproductions of a party's submissions are not uncommon, as "[t]he trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning." *Prowell*, 741 N.E.2d at 708. The need to keep the docket moving is properly a high priority for our trial bench. *Id*. at 709. For this reason, the practice of adopting a party's proposed findings is not prohibited. *Id*. Thus, although we by no means encourage the wholesale adoption of a party's proposed findings and conclusions, the critical inquiry is whether such findings, as adopted by the court, are clearly erroneous. *See Saylor v. State*, 765 N.E.2d 535, 565 (Ind. 2002) (citing *Woods v. State*, 701 N.E.2d 1208, 1210 (Ind. 1998)).

[17] Mother concedes that the wholesale adoption of one party's proposed findings of fact is not error *per se*. However, Mother contends that the trial court's admission of the following findings relating to the *initial removal* of the Children from her care was error:[3]

> Finding 8 b: Remaining in the home would be contrary to the welfare of the child because of Mother's and Father's inability, refusal, or neglect to provide shelter, care and/or supervision at

---

[3] Mother also contends that the trial court erred in adopting Findings 14 p., 14 r., and 16 e. We decline to review those findings as they relate to Father.

the time;

> Finding 8 c: Reasonable efforts to prevent or eliminate removal of the Child were made by DCS as set forth in the pleadings, documents, of DCS and/or all other service providers.

(Appellant's App pp. 7, 8).[4] Mother maintains that the above findings are factually inaccurate. We note that Mother has sparsely developed this argument, thereby waiving it on appeal. *See* Ind. Appellate Rule 46(A)(8)(a). Waiver notwithstanding, we find that the admission of the above findings was not error. With respect to Finding 8 b, the record shows that the Children were removed from Mother's care when she attempted to end her life and the only other adult present was taking drugs intravenously in the bathroom. As for Finding 8 c, DCS argues that it took reasonable efforts to prevent or eliminate removal of the Children from Mother's care. Specifically, DCS notes that the Children were only removed from Mother's care after DCS assessed the situation, *i.e.*, Mother was unavailable since she had been admitted to the hospital due to a drug overdose, and Father's whereabouts were unknown. Based on the foregoing, we find no error in the admission of the above findings.

[18] In addition, Mother challenges two findings relating to the Children's *continued removal* from her care:

---

[4] As noted in the forgoing, the trial court entered separate findings of facts and conclusion of law terminating Mother's parental rights for B.H. and A.H. Findings 8 b., 8c., 14, and 18 are identical as to each child.

> Finding 14: Mother participated in supervised visits with the Child but providers raised concerns with her level of intoxication during visitations;

> Finding 18: Mother has not maintained stable housing in the past three (3) years.

(Appellant's App. pp. 15, 16). With regards to Finding 14, Mother argues that she "had been groggy at one visit because she had not had any sleep the night before because she had been . . . cleaning houses." (Appellant's Br. p. 7). At the termination hearing, FCM Myers testified that visitations never advanced to being unsupervised due to "ongoing concerns of [Mother's] sobriety." (Tr. p. 18). Specifically, FCM Myers stated that "the visit supervisor would notice that Mother would be very tired or . . . seemed like she was falling asleep or under the influence of something." (Tr. pp. 18-19). Similarly, the evidence on record supports that finding.

[19] Lastly, with respect to Finding 18, Mother claims that "she had resided with a good friend . . . for a little over a year." (Appellant's Br. p. 8). Mother contends that "staying with a friend of the family does not show a failure to maintain stable housing and has no relevance as to whether she should lose her parental rights . . ." (Appellant's Br. p. 8). The record reveals that at the time of the termination hearing, Mother lived with an older gentleman, T.S. Mother claimed that T.S. was a family friend. Although Mother did not pay rent, she stated that she assisted T.S. with house chores and paid some of the bills. Mother indicated that prior to living with T.S., she had lived with friends.

[20]     In support of her argument, Mother relies on *Tipton v. Marion Cnty. Dep't. of Public Welfare*, 629 N.E.2d 1262, 1267–68 (Ind. Ct. App. 1994), and *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 151 (Ind. 2005). In *Tipton*, in terminating a father's parental rights, the trial court found, among other things, that the father failed to demonstrate that he maintained stable housing. *Tipton*, 629 N.E.2d at 1267. The record showed that since the child's birth—a period of a little over four years—father had lived at three different residences, all belonging to family members. *Id.* Three persons including father lived at his grandmother's house which had four bedrooms. *Id.* Four people including father lived at his aunt's home which had three bedrooms. *Id.* Father paid rent when he lived at those places. *Id.* And at the time of the termination hearing, father was living with his brother in a four-bedroom house with five other people, including the child's cousins. *Id.* Reversing the judgment of the trial court, this court determined that the notion that father's living arrangement justified terminating his parental rights, "reflect[ed] a class or cultural judgment . . . ." *Id.* [Instead], "[p]arental unfitness must be established on the basis of individualized proof." *Id.* at 1268. Noting that the trial court "did not conclude that [father] could not provide his child with an adequate home because he moved too frequently or that these places were not suitable for a child," this court concluded, "[t]he evidence offered on the matter of housing does not support a reasonable inference that [father's] living arrangements pose or have ever posed a threat to the well-being of his child." *Id.* at 1267-68. In fact, the court observed that father's living arrangement with his extended family provided the child a "safety net." *Id.* at 1268.

[21] In *Bester,* father lived with his parents for most of his life. *Bester*, 839 N.E.2d at 151. At the time of his child's birth, father lived with mother in Indiana, and shortly thereafter, he moved back to his parents' house in East Hazel Crest, Illinois. *Id.* Father resided with his parents until a home study was conducted. *Id.* At that point, the family case manager informed father that, as a result of the home study, he could no longer reside in his parent's home if the child was going to be placed there. *Id.* Father left and moved in with a friend for about two months. *Id.* Thereafter, he moved to Chicago, Illinois to live with an aunt, where he paid rent. *Id.* Our supreme court in this case found *Tipton* was instructive, and it reversed the trial court since father had complied with all DCS services and there was no evidence that the father's "living arrangements and his alleged lack of independence pose or have ever posed a threat to the well-being of the child." *Id.*

[22] Here, DCS maintains that *Tipton* and *Bester* are distinguishable from the present case. We agree. Although we agree with Mother that DCS offered no kind of particularized evidence that living with friends refutes her ability to maintain a stable home for the Children, or that T.S.'s home was unclean or ever posed a threat to the well-being of the Children, DCS offered evidence that they were concerned about Mother being kicked out of T.S.'s home. The record shows that Mother struggled with drugs, and T.S. had informed DCS that he would kick her out if he found her using drugs. Shortly before the termination hearing, Mother had relapsed. Based on that fact, DCS argued Mother's housing arrangement remained unstable. Equally, we find that the record

supports Finding 18, and we therefore find no error in the admission of that finding.

## II. *Termination of Parental Rights*

[23] The traditional right of parents to direct the care, custody, and control of their "children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d at 1259 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution prevents the State from unduly interfering with parents' decisions regarding the upbringing of their children. *C.A. v. Ind. Dep't. of Child Servs.*, 15 N.E.3d 85, 93 (Ind. Ct. App. 2014). However, parental rights are not absolute; in fact, they are "subordinate . . . to the children's interests when the children's emotional and physical development is threatened." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*.

[24] A court may terminate parental rights "when parties are unable or unwilling to meet their responsibility as parents." *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Because the termination of parental rights permanently severs the parent-child relationship, it is an extreme sanction that "is intended as a last resort, available only when all other reasonable efforts have failed." *C.A.*, 15 N.E.3d at 92. The purpose of termination is to protect the children, not to punish the parents. *Lang*, 861 N.E.2d at 371. In such cases, Indiana law stipulates that DCS must establish, in part,

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

* * * *

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each statutory element by clear and convincing evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014).

A. *Reasonable Probability That Conditions Will Not Be Remedied*[5]

Mother contends that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in the Children's initial removal and placement in foster care will not be remedied.

---

[5] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Indiana Code section 31-35–2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of Children outside the home will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

In making this determination, a trial court should assess the "parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. This entails an evaluation of "the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* The trial court "may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment[,]" as well as the parent's response to any services offered by DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[26] Initially, DCS intervened and removed the Children due to Mother's suicide attempt. Mother claims that it is mere speculation that she might undertake another suicide attempt. We note that subsection (b)(2)(B)(i) of the termination statute requires that DCS must establish a reasonable probability that "the conditions that resulted in the child's removal or *the reasons for placement outside the home of the parents will not be remedied.*" I.C. § 31-35-2-4(b)(2)(B)(i) (emphasis added). "This language clarifies that it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.,* 825 N.E.2d at 806.

[27] The record indicates that this was not Mother's first contemplated suicide. At the start of the CHINS case, Mother's relatives stated that Mother suffered from depression, and she had made prior attempts to end her life. At the termination

hearing, Mother stated that her depression triggered her drug relapse. We note that Mother's drug addiction predates her early teenage years, and when DCS became involved, it recommended Mother for substance abuse treatment. In the fall of 2013, Mother successfully completed a drug treatment program at Aspire. In March 2014, Mother self-referred herself for treatment. FCM Myers stated that it was unclear why Mother enrolled herself into that clinic. After only two months, Mother was discharged from the clinic after testing positive for Xanax and marijuana. Mother had lied to FCM Myers about why she had been dismissed from the clinic. In August 2014, DCS referred Mother back to treatment. There is no indication of Mother ever resuming treatment, but there is evidence that Mother was on probation for an unrelated matter. In October 2014, Mother violated her probation after testing positive for Benzodiazepines and Buprenorphine and was incarcerated for about a month. Shortly before Mother's termination hearing, Mother had once again violated her probation by testing positive for drugs in November 2014 and in December 2014.

[28] "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). FCM Myers stated that Mother would be consistent for a couple of months and then relapse. Here, we find that Mother's continued use of drugs does not bode well for her prospects of successfully parenting the Children. Mother had numerous opportunities to show that she could change her life around through treatment, but she has

failed to follow through. Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability the conditions resulting in the Children's removal and continued placement outside Mother's care will not be remedied. Mother's arguments to the contrary, including her arguments that she would not attempt to take her life again, or that she is currently on medication for her depression, amounts to an invitation to reweigh the evidence. *See In re G.Y.*, 904 N.E.2d at 1260.

## B. *Best Interests*

[29] Lastly, Mother argues that that there is insufficient evidence to support the trial court's conclusion that termination of the parent-child relationship is in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.F.*, 762 N.E.2d at 1253. In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id*. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. *A.D.S. v. Ind. Dep't. of Child Servs.*, 987 N.E.2d 1150, 1158–1159 (Ind. Ct. App. 2013), *trans. denied*.

[30] Mother argues that she had subpoenaed her counselor to testify at the termination hearing, but the counselor failed to appear. Mother further

contends that the counselor's testimony would have corroborated her recent depression treatment, which would, in turn, show that a drug relapse was unlikely. The trial court heard Mother's testimony in this regard, and Mother's current argument is merely an invitation for us to reweigh the evidence. *See In re G.Y.*, 904 N.E.2d at 1260.

[31] Turning to the facts of this case, both FCM Myers and the CASA testified that, in their opinions, termination was in the Children's best interests. *See A.D.S.*, 987 N.E.2d at 1158. FCM Myers stated, "I think [B.H.] and [A.H.] deserve to be in a structured environment and stable environment that is drug free. And at this point I do not believe that [Mother] would be able to provide that on a consistent basis . . . due to multiple relapses." (Tr. p. 24). Despite Mother's claim that she worked odd jobs and got paid under the table, FCM Myers testified that Mother had failed to verify her income. As for housing, FCM Myers stated that T.S. had threatened to eject Mother if he found her using drugs. The record also reflects that the Children had suffered from a lack of permanency, but had improved while residing with their current, pre-adoptive caregivers since February 2013. In support, FCM Myers stated that the Children were active in school, enjoyed their after-school activities, loved their neighborhood, and appeared to be more relaxed in their current placement. In addition, the CASA recommended the termination of Mother's parental rights due to Mother's sobriety issues, drug issues, as well as Mother's potential pending incarceration for probation violations.

[32] Based on the totality of the evidence, coupled with the testimony from FCM Myers and the CASA recommending termination of Mother's parental rights, we conclude that there is ample evidence to support the trial court's conclusion that termination of Mother's parental rights is in the Children's best interests.

## CONCLUSION

[33] Based on the foregoing, we conclude that (1) there was no error in the adoption of DCS' findings, and (2) there was clear and convincing evidence to support the termination of Mother's parental rights.

[34] Affirmed.

[35] Brown, J. and Altice, J. concur