## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 17 2016, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| --- | --- |
| Stephen T. Owens<br>Public Defender of Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| Steven H. Schutte<br>Deputy Public Defender<br>Indianapolis, Indiana | Kelly A. Loy<br>Deputy Attorney General<br>Indianapolis, Indiana |

IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| Tyrice Halliburton,<br>*Appellant-Petitioner*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent*. | October 17, 2016<br><br>Court of Appeals Case No.<br>20A03-1604-PC-685<br><br>Appeal from the Elkhart Circuit Court<br><br>The Honorable Terry C. Shewmaker, Judge<br><br>Trial Court Cause No.<br>20C01-1403-PC-7 |

**Brown, Judge.**

Tyrice Halliburton appeals the denial of his petition for post-conviction relief. Halliburton raises one issue which we revise and restate as whether he was denied the effective assistance of trial counsel. We affirm.

## Facts and Procedural History

The relevant facts as discussed in Halliburton's direct appeal from his conviction for murder follow:

> On March 18, 2008, responding to a 911 call, police discovered the lifeless body of Sheena Kiska in her apartment in Bristol, Indiana. The base of her skull was fractured, a stab wound of great force had gone through a rib and organs, and a knife wound had severed her carotid artery as well as the jugular veins on both sides of her neck. In all, Kiska had received more than fifty stab wounds. Multiple bloody knives were found in the apartment, and blood splatters, smears, and droplets were abundant in the apartment. Two days later officers returned to the apartment to conduct further investigation but were unable to gain entry because other officers had changed the lock on the door for security reasons. Halliburton, who lived in the apartment next door, observed the officers having difficulty entering Kiska's residence and retrieved a tool from his own apartment that appeared to be "a little screwdriver that kind of ha[d] a bend on the top of it." Tr. at 225. With the officers' permission, Halliburton used the screwdriver to unlock the door in a manner the officers "had never seen" before. Tr. at 225.
>
> Halliburton was interviewed by the police three different times in the days following Kiska's death. During the first and second interviews, Halliburton stated that he left for a veterinary appointment at 1:15 the afternoon of the killing but claimed to have seen Kiska and her daughter standing outside by a white truck when he left. During the third interview, Halliburton

initially began by reiterating his prior story but then offered a different account of what he had seen that day. During this interview, Halliburton claimed that he saw another resident in the hallway exiting Kiska's apartment as he was leaving for the veterinarian. He further declared that he heard noises coming from Kiska's apartment at which point he "propped the door just a little bit," Tr. at 420, and "saw [the resident] in there cutting her up." Tr. at 421. Halliburton described the layout of Kiska's apartment and was "[v]ery detailed" about where the furniture was located and where the attack occurred. Tr. at 426. He identified the exact locations of where she had been stabbed and said that Kiska's face looked like "a piece of meat." Tr. at 429. Halliburton also said that Kiska had been attacked because "she came in at the wrong time." Tr. at 431. After the interview, the investigating officer tried to confirm Halliburton's claim with respect to where he said he had been standing when he peered through Kiska's door and purportedly witnessed the attack. However, the officer determined that it would have been physically impossible for Halliburton to have seen the attack from a crack in the door; instead he had to have been at least "two to three feet" inside the apartment. Tr. at 433. Around this same time officers recovered from Halliburton's car a DVD player that had been taken from Kiska's apartment about a month earlier.

The investigation continued, and in August 2010, Halliburton sent a letter to the police saying, "I want to clear [the resident's] name. I didn't really see him doing it." Tr. at 433-34.

*Halliburton v. State*, 1 N.E.3d 670, 673-674 (Ind. 2013).

[3] The State charged Halliburton with murder. *Id.* at 674. Alleging he committed the murder by intentionally killing the victim while committing or attempting to commit burglary, pursuant to Ind. Code § 35-50-2-9(b)(1)(B), the State filed an

amended information in January 2012 seeking life imprisonment without parole. *Id.* The State also charged Halliburton as an habitual offender. *Id.*

> Trial began April 16, 2012. During the guilt phase, testimony largely from State's witness Nicole DeFronzo revealed that in early 2008 she and her then-boyfriend Halliburton lived together in an apartment next door to Kiska. On March 18, 2008, Halliburton took his cat to a veterinary appointment where he had arranged to meet DeFronzo. Halliburton told DeFronzo that he had entered Kiska's apartment when she was not there. However, Kiska came home unexpectedly, and a struggle ensued resulting in her brutal death. More precisely, according to DeFronzo, Halliburton told her that when Kiska came home, "he didn't want to get caught so he killed her." Tr. at 523. Halliburton left Kiska's apartment and changed his bloody clothes. DeFronzo helped dispose of the clothes and they drove to the home of DeFronzo's mother, a registered nurse, who bandaged a wound on Halliburton's hand. For over three years DeFronzo did not reveal to anyone what Halliburton had told her about Kiska's death. Nor had she revealed her own complicity in helping get rid of evidence.

> During trial the State introduced numerous exhibits including photographs of the crime scene, pre and post autopsy photographs, and a rib bone of the victim that had been removed during autopsy. The State also introduced evidence that Halliburton had committed a burglary of Kiska's apartment approximately a month prior to the killing; and for which the trial court gave a limiting instruction. Further the State called DeFronzo's mother as a witness who testified, among other things, that she had counseled her daughter to come forward with what she knew and "to tell the truth." Tr. at 484.

*Id.* at 674-675.

[4]     The jury found Halliburton guilty of murder. *Id.* at 675. At the mitigation evidentiary stage, Halliburton's trial counsel stated outside the presence of the jury that his staff had done an extensive amount of work compiling various records from various institutions and medical facilities and that "[h]aving gone through all these and having had my staff go through all of these, I have made the decision to sort of cut down and go basically to the heart issues [sic] that we believe are here." Trial Transcript at 710. He also stated that "many of the things in these records are not, in my opinion, and would not be helpful to my client in presentation of the mitigation issue." *Id.* The court commented that the stack of materials was about ten inches tall and clarified with defense counsel that he did not elect to use them because they were not favorable to Halliburton. Trial counsel stated: "I know that my reading of them suggests that they would not be favorable at all." *Id.* The court asked: "So are you intending those to be part of the record, or are you just showing them to the Court now?" *Id.* at 710-711. Trial counsel stated: "I'm going to show these to the Court now, and then I could provide the Court with my own staff's records." *Id.* at 711. The court asked the prosecutors if that was a problem, and one of the prosecutors said no.

[5]     In the presence of the jury, trial counsel then examined Sharon Bryson, Halliburton's mother. Bryson testified that Halliburton had no relationship with his father for most of his life after his father turned his back on him when Halliburton was about two or three years old and that Halliburton tried to communicate with his father but his father rejected him. According to Bryson's

testimony, Halliburton walked and talked at an early age and he fell out of a second floor window and landed headfirst on concrete when he was about two or three. She took him to the hospital, and the doctors told her that he had a slight concussion and no broken bones and just to keep an eye on him. In Halliburton's young years, Bryson became concerned that he should be reexamined regarding the head issue because his motor skills started changing when he was about four years old. She took Halliburton to family doctors, to the hospital, and different centers including Oaklawn and Koala. Bryson made attempts to have Halliburton evaluated at various places. The school system labeled him as having "attention deficit, impulse control, and a learning disability." *Id.* at 722.

[6] During cross-examination, Bryson testified that the injury occurred about the time Halliburton's father left and it was not until he was about four years old that he started having some differences in his personality. After Bryson's testimony, the court asked defense counsel if he had other evidence, and defense counsel stated that he had one document. The court indicated that the document would be marked as Defendant's Exhibit A, the prosecutor stated that she had no objection to Exhibit A being admitted, defense counsel asked that the copies be displayed to the jury, and the court indicated that copies of Exhibit A would be sent into the jury room. Defendant's Exhibit A consists of a 1995 record from Oaklawn Hospital when Halliburton was fourteen years old which states in part that it provided an update since Halliburton's last hospitalization in 1990 when he was diagnosed with attention deficit disorder

with hyperactivity, oppositional defiant disorder, and a psychotic disorder, that Halliburton denied any symptoms of psychosis, that a doctor "was requesting a thorough neurological workup," that Halliburton's mother "concurred with this belief and she based this all on the fact that her son had a significant fall at the age of three," and that "[a]lthough the patient may have chronic problems it is perceived that the acute crisis may center around the patient having an untreated attention deficit disorder." Defendant's Exhibit A.

[7] The jury recommended life imprisonment without parole. *Halliburton*, 1 N.E.3d at 675. Halliburton admitted to being an habitual offender. *Id.* Following a sentencing hearing, the trial court sentenced Halliburton consistent with the jury's recommendation. *Id.* On direct appeal, Halliburton argued that the trial court erred in admitting certain evidence and providing a limiting instruction. *Id.* The Indiana Supreme Court affirmed. *Id.* at 684.

[8] Halliburton filed a petition for post-conviction relief on March 3, 2014, and later amended the petition on June 22, 2015. Halliburton asserted in part that his trial counsel was ineffective for failing to adequately investigate, prepare for, and present evidence which would mitigate against a sentence of life without parole.

[9] On August 20, 2015, the court held an evidentiary hearing. The court admitted the trial record. Halliburton's lead trial counsel, Clifford Williams, testified that he began practicing law in about 1979, that he began handling criminal cases in 1980, that he completed a twelve-hour training seminar for either life without

parole cases or death penalty cases prior to Halliburton's case, and that he was the Chief Public Defender for Elkhart County. Attorney Williams testified that he had experience with the concept of developing mitigation and had Minette Zeitler, a mitigation expert, working for him, and he described her as "well versed" and "well qualified." Post-Conviction Transcript at 8. According to Attorney Williams, Zeitler did a "very, very good job of finding school records, health records," and matters that would pertain to Halliburton's past. *Id.* He testified that he spent time with Halliburton's mother and learned as much as he could about his childhood and thought process.

[10] When asked why he did not hire a mental health expert, Attorney Williams stated:

> From the standpoint of working the underlying case, at no time did I ever view, or see, Mr. Halliburton as a person who was, number one, certainly he was competent, and, number two, he seemed to be pretty much in charge of – of where he wanted things to go. He was always amenable. Amenable, I mean, he was always good to work with. He seemed to be in complete control of his faculties and the one thing that did arise, during the course of our looking into his past, and whatnot, was that his mom had indicated that he had a fall from a second story window at some point during his childhood.
>
> So, other than that, he was a very engaged participant from the standpoint of a client input and I – I didn't really see the need for a mental health professional.

*Id.* at 9-10.

[11] During cross-examination, when asked if he took great pains in order to find any mitigation evidence that he found credible to present to the court for purposes of consideration during sentencing, Attorney Williams answered:

> Credible is the key word. Ideal, hopefully, as much as I can in reality, and some things don't seem to me to be sensible and particular when attempting to put forth an argument to accord with great experience and even further than that, in a trial it's not good practice, in my opinion, to attempt to hoodwink a jury. So, I try to stay transparent.

*Id.* at 15. Attorney Williams testified that he felt very comfortable with the amount of time that his investigator, Bill Clark, spent with him and Halliburton, that he spent time with Halliburton's mother, and that Halliburton was always amenable, helpful, demonstrative, engaged, and able to express his view of whatever discovery he would be presenting. Attorney Williams also testified that he at no time felt that Halliburton "either didn't get it, or wasn't following, or didn't understand it." *Id.* at 20.

[12] Attorney Williams testified that his mitigation expert obtained records from Oaklawn. He testified that he called Halliburton's mother to testify at the mitigation evidentiary stage because he thought "a mother might strike a chord of sympathy," she knew him better than anyone, she was articulate, she presented well, and he was comfortable in giving her the opportunity to try to show the jury that Halliburton was deserving of something less than life without parole. *Id.* at 27. Attorney Williams testified that he thought Halliburton's mother testified regarding the injury Halliburton suffered as a child and that a

"somewhat subtle goal" would have been to illustrate that perhaps he had some kind of injury to his brain that might cause issues with his behavior. *Id.* at 28. Attorney Williams testified that evidence that Halliburton had some type of an injury that caused him disconnect or a challenge with his mental processes such that he might have trouble with impulse control or rage would be a double-edged sword and that if you inject fear a jury would err on the side of caution and lock someone up as long as they can. Attorney Williams testified:

> If there had been something other than a reported fall, which I, probably because of lack of economic ability, maybe wasn't followed up on and there did not seem to be a substantial enough basis had his conduct and demeanor and his ability to work with me and my investigator, and I – with whomever he came in contact, it didn't raise that type of flag. Now, if we now know he has some problem, had an injury that, in fact, is capable of being proven, then I should have done it.

*Id.* at 34-35. When asked if he had found that Halliburton had issues with impulse control, rage, anger, or ability to conform and whether that would be something he would want in front of a jury, Attorney Williams testified that "if you put what I consider nonsense in front of people, or if you put things that in gender [sic] fear, it's – it's a double edged sword." *Id.* at 35. He testified that adding more fear to the jury would not have been a good tactical move.

[13] Dr. Corby Bubp,[1] a psychologist and a neuropsychologist, testified that he evaluated Halliburton on June 13th and 14th and reviewed records from Halliburton's psychiatric stays in 1990 and 1995. Dr. Bubp concluded that Halliburton had some subtle brain damage or subtle cognitive information processing issues that impact how he sees the world and makes judgments and influences his actions, that he has an encephalopathy, which is a generic word for brain damage, that his IQ "in several of his skills, cognizant skills are intact, or in average range; but he has some very strong weaknesses in planning, organization." *Id.* at 40. He testified that there is a lesion or an impairment, or part of his brain that is just not working.

[14] Dr. Bubp testified that psychiatric records revealed that a physician or facility had found a condition called dysdiadochokinesia, which is basically the inability to replicate or repeat motor movements over and over, and that it would be standard practice to call for a neuropsychological evaluation on the basis of the records. He testified that he saw very brief reports of a fall that Halliburton had when he was two years old, and that "from what was described as a 12 foot fall – that wouldn't have been the traditional soccer field accident. That would have been much more of a force issue." *Id.* at 47. He also testified that "I don't know that it was a simple concussion. It could have been a mild – what I call a mild to moderate TPI, which would have been more severe and had more lasting repercussions." *Id.* He stated that he found Halliburton's

---

[1] The transcript spells Dr. Bubp's name as Buck, but his curriculum vitae lists it as Dr. Bubp.

reading and math abilities to be about the beginning of fourth grade level and that his memory was generally low average to average.

[15] During cross-examination, Dr. Bubp testified that most people with a front lobe injury "do not really have a rage issue" and that they actually become more docile, but that a combination of orbital frontal injury in the context of some paranoia ideas or distrust of others and a history of violence or abuse "then you do tend to migrate more towards violent acts and trouble with the law and things of that nature." *Id.* at 51. Dr. Bubp stated that Halliburton had some impulse control issues, and when asked whether Halliburton displayed some rage control issues, Dr. Bubp testified: "Mild. He was in context." *Id.* at 52. He also stated that Halliburton would have a quick emotional reactivity, which he would see the physiological signs of the stress, and that he would always be able to compose himself in testing, usually within about fifteen to thirty seconds, which is longer than most people he tests. He testified that Halliburton met the criteria for borderline to mild personality disorder for narcissism and was fully inclusive in the antisocial personality disorder. In terms of "crim[in]alistic behavior," Dr. Bubp testified that Halliburton is much more likely to make judgments for himself and much more self-centered than most without the ability to fully see how consequences fall on others. *Id.* at 55. He also stated that Halliburton is more prone to criminal behavior given the challenges with his frontal lobe processes.

[16] Halliburton's trial co-counsel, Matthew Johnson, testified that he had received twenty-four hours of training in a death penalty seminar by the time of the trial,

his role was to help the mitigation expert, they requested and received voluminous records from Halliburton's past, he spent hours at the jail interviewing Halliburton, and that they also met with his family. He testified that he did not hire a mental health expert, and that he did not remember a reason.

[17] On March 7, 2016, the court denied Halliburton's petition. The order states in part:

> 16. [Halliburton] was represented at trial by Clifford Williams, the Chief Public Defender for Elkhart County, and Deputy Public Defender Matthew Johnson, during both the guilt phase and the enhancement phase. Mr. Williams testified that he has been engaged in the practice of criminal defense law since 1980, and has defended hundreds of criminal defendants at trial, including fifteen (15) to twenty (20) defendants charged with Murder. Mr. Williams testified that he has also participated in other capital cases and has received formal training and experience in defense of Death Penalty and Life Without Parole enhanced cases. Mr. Williams also testified that he retained a Mitigation Expert, Manette Zeitler, a person Mr. Williams believed was "well-versed" and "well-qualified" in capital case mitigation proceedings, for the purpose of researching viable defenses and evidence for the enhancement phase of [Halliburton's] trial.

> 17. Additionally, Mr. Williams said he engaged in several hours of interaction and consultation with [Halliburton] and did not view [him] as a person "not competent." To the contrary, Mr. Williams stated that he believed [Halliburton] "to be in charge of where he wanted things to go" and "in complete control of his faculties." Further, Mr. Williams advised that [Halliburton] was

"very engaged" during their conversations, was very helpful with discovery, and was an active participant in his defense.

18. Further testimony by Mr. Williams revealed that he was aware that [Halliburton] had suffered a closed head injury during a fall as a young child. However, based upon his interactions with [Halliburton], along with reviewing documents and information in preparation for the mitigation evidence during the enhancement phase of the trial, Mr. Williams said he decided not to consult with or retain a mental health expert as he believed the best mitigation evidence would be in the form of sympathetic testimony from [Halliburton's] mother regarding [his] injury, childhood, decision making challenges, and emotional challenges. Mr. Williams also said that the evidence was overwhelming, and the crime scene was very disconcerting. Mr. Williams went on to say that he believes counsel should be careful what to give a jury because any evidence that might inject fear might cause jurors to err on the side of caution. Mr. Williams said his opinion was that he made a good tactical choice not to raise any unnecessary red flags.

* * * * *

20. Matthew Johnson testified that his primary role in Petitioner's case was to work with Manette Zeitler, the mitigation expert, who obtained documents and information in the form of school records, records from the Department of Correction regarding [Halliburton's] behavior and mental health, as well as other health records, and who spent a great deal of time interviewing [Halliburton's] mother regarding [his] thought process capabilities and childhood. Mr. Johnson said he recalled receiving and reviewing these records and interviewing [Halliburton] and [his] family.

21.  Based on the foregoing, there is extensive evidence establishing that trial counsel explored [Halliburton's] prior education, health, and life experiences relative to his decision making processes and abilities to function in society.  Counsel was fully aware of [Halliburton's] prior head injury and propensity for rash decisions; therefore, prompting counsel to review [Halliburton's] mental health records, mental and medical health history, educational history, and behavioral history.  After considering all these, counsel made a strategic decision to present these through testimony of his mitigation expert Manette Zeitler and [Halliburton's] mother.

22.  [Halliburton] also presented the testimony of a neuropsychologist Dr. Corby Bubp.  Dr. Bubp testified that he believed [Halliburton] possessed average IQ and cognitive skills; however, he believed [Halliburton] suffers from a frontal lobe brain impairment which results in [Halliburton] having "quick emotional reactivity," psychopathic behavior, and challenges with rage impulse control.  Accordingly, [Halliburton] poses a danger to himself and others.  Dr. Bubp also said that it was his opinion that [Halliburton] is more prone to criminal behavior than others.  This evidence, in itself, suggests that [Halliburton] is a significant danger not only to himself, but also to any community to which he may be released in the future.  Accordingly, the jury is not likely to have reached a different outcome had expert testimony such as Dr. Bubp's been presented at trial.

Appellant's Appendix at 61-63.

### *Discussion*

[18]  The issue is whether Halliburton was denied the effective assistance of trial counsel.  Before discussing Halliburton's allegations of error, we note the general standard under which we review a post-conviction court's denial of a

petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* Further, the post-conviction court in this case entered findings of fact and conclusions thereon in accordance with Indiana Post-Conviction Rule 1(6). "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

[19] Halliburton argues that his trial counsel gathered the proper documents but failed to appreciate what the data revealed and points to testimony of his trial counsel that "if Halliburton 'has some problem, had an injury that, in fact, is capable of being proven, then I should have' consulted with an expert." Appellant's Brief at 7 (quoting Post-Conviction Transcript at 35). Halliburton further contends that a part of his brain does not work properly and that it was caused by physical structural damage to his brain. Halliburton argues that his

trial counsel failed to prepare adequately to present evidence from which to argue that he committed criminal acts that are attributable to a disadvantaged background or to emotional or mental problems and that therefore he is less culpable than defendants who have no such excuse. He cites *Wiggins v. Smith* 539 U.S. 510, 123 S. Ct. 2527 (2003), and argues that his trial counsel shelved their investigation and preparation at an unreasonable point in the case. He also argues that the jury should have known that he has a brain injury that affects his behavior.

[20] The State argues that trial counsel conducted a reasonable investigation to develop mitigation evidence, and that trial counsel made a reasonable strategic decision not to obtain an expert such as Dr. Bubp, and instead present the testimony of Halliburton's mother. The State also asserts that Halliburton has failed to show that he was prejudiced by the decision not to present testimony from someone such as Dr. Bubp.

[21] Generally, to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* The principal concern in deciding whether trial counsel exercised reasonable and professional judgment is not whether counsel should have presented certain evidence, rather we focus on whether the investigation

supporting counsel's decision not to introduce certain evidence was itself reasonable. *See Wiggins v. Smith*, 539 U.S. 510, 522-523, 123 S. Ct. 2527, 2536 (2003). In assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Id.* at 527, 123 S. Ct. at 2538.

[22] To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *French*, 778 N.E.2d at 824. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

[23] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S.

Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998).

[24] In considering the reasonableness of trial counsel's investigation and the quantum of evidence known to counsel, we observe that Attorney Williams testified that Zeitler, the mitigation expert, did a "very, very good job of finding school records, health records," and matters that would pertain to Halliburton's past including records from Oaklawn. Post-Conviction Transcript at 8. Attorney Johnson testified that they requested and received voluminous records from Halliburton's past, that he spent hours at the jail interviewing Halliburton, and that they also met with his family. At trial, Attorney Williams referred to the records, and the court commented that the stack of materials was about ten inches tall. As to whether the known evidence would lead a reasonable attorney to investigate further, Attorney Williams indicated that he did not see the need for a mental health professional and that Halliburton was competent, amenable, always good to work with, a very engaged participant, and someone who seemed to be in complete control of his faculties. Under the

circumstances, we cannot say that the performance of Halliburton's trial counsel was deficient.[2]

[25]　In addition, we cannot say that Halliburton demonstrated that the result of the proceeding would have been different had his trial counsel hired a mental health expert. Dr. Bubp indicated that Halliburton displayed a mild rage control issue, that he is much more likely to make judgments for himself and much more self-centered than most without the ability to fully see how consequences fall on others, and that he is more prone to criminal behavior given the challenges with his frontal lobe processes. Attorney Williams testified that evidence that Halliburton had some type of an injury that caused him disconnect or a challenge with his mental processes such that he might have trouble with impulse control, or rage would be a double-edged sword and that if one injects fear then a jury would err on the side of caution and lock someone up as long as they can. We cannot say that Dr. Bubp's testimony undermines confidence in the outcome or that Halliburton has demonstrated that he was prejudiced.[3]

---

[2] Halliburton cites *Prowell v. State*, 741 N.E.2d 704 (Ind. 2001), and asserts that in that case the sentencer had an incorrect view of the defendant's mental health because of counsel's failure to identify their client's illness and provide an expert with sufficient information. In *Prowell*, unlike the present case, trial counsel testified at the post-conviction hearing that from the outset of their representation, they believed Prowell to be "mentally unsound" or "mentally ill." 741 N.E.2d at 713. We find *Prowell* distinguishable.

[3] To the extent Halliburton cites *Wiggins*, we observe that the mitigating evidence counsel failed to discover and present in *Wiggins* was "powerful" and included severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. 539 U.S. at 534-535, 123 S. Ct. at 2542. The defendant suffered physical torment, sexual molestation, and repeated rape during his subsequent years in

## *Conclusion*

For the foregoing reasons, we affirm the post-conviction court's denial of Halliburton's petition for post-conviction relief.

Affirmed.

Robb, J., and Mathias, J., concur.

---

foster care. *Id.* at 535, 123 S. Ct. at 2542. We find the evidence presented by Dr. Bubp's testimony distinguishable.