## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 29 2017, 11:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Kathleen Cleary
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joshua J. Fairley,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

December 29, 2017

Court of Appeals Case No.
82A04-1703-PC-575

Appeal from the Vanderburgh
Circuit Court

The Honorable David D. Kiely,
Judge

The Honorable Kelli E. Fink,
Magistrate

Trial Court Cause No.
82C01-1203-PC-5

**Mathias, Judge.**

Joshua Fairley ("Fairley") pleaded guilty to murder in Vanderburgh Circuit Court. Fairley later sought post-conviction relief, which the post-conviction court denied. Fairley appeals and argues that the post-conviction court clearly erred in rejecting his claims that his trial counsel was ineffective, that his guilty plea was not knowingly and voluntarily made, and that the trial court erred by not *sua sponte* conducting a competency evaluation.

We affirm.

## Facts and Procedural History

*A. The Shooting*

On the night of June 23, 2010, Fairley was at his home in Evansville with Summer Jones ("Jones"). Jones had previously been in a relationship with Fairley, and the two were in bed. At some point late that night or early the next morning, someone began to pound on the door and walls of Fairley's home. Jones figured that the person causing the commotion was Fairley's ex-girlfriend, as Fairley had told Jones that he had recently broken up with his girlfriend, and she was correct. Jones heard the sound of glass break and heard Fairley tell the ex-girlfriend, later identified as sixteen-year-old H.G., to leave. H.G. told the then thirty-year-old Fairley that she wanted to resume their relationship, but Fairley told her that their relationship was over because H.G. had indicated that she desired to have sex with another man. As Jones dressed and readied to leave the house, she saw H.G. attempt to enter the home through a window while Fairley was preventing her from doing so. Upon

seeing Jones, H.G. stated, "Who you got in here? A sixteen year old? Is it a sixteen year old?"[1] Ex. Vol., Petitioner's Ex. 8, p. 161. H.G. eventually entered the house, apparently through the door, and wanted to physically fight Jones. H.G. entered the kitchen where Jones was and lunged at her, but was restrained by Fairley, who told Jones to leave through the front door. Jones did not see H.G. with any weapons, but knew that her ire was directed toward Jones.

[4] Jones left Fairley's home and walked to her father's house nearby, forgetting that her own vehicle was parked outside Fairley's home. She later woke her father up and asked him to drive her back to Fairley's home so that she could get her vehicle; she also wanted her father to be there in case H.G. was still at Fairley's house and tried to fight her. When Jones returned to her vehicle, she noticed that the passenger side window had been broken. Jones called the police to report the broken window, and an officer arrived and took a statement from her. The officer then went to Fairley's front porch and knocked on the door, but no one answered. The officer found a purse and wallet on the front porch, and found two pieces of identification. He showed them to Jones, who identified one of the pieces of identification as belonging to the girl she had seen enter Fairley's home, H.G. Jones then left to get her vehicle repaired.

[5] Later that day, June 24, Fairley failed to show up to work at a local pizzeria. The owner of the establishment telephoned Fairley but got no answer. He then

---

[1] Jones was twenty-six years old at the time.

sent another employee to check on Fairley. This employee called back at around 5:00 p.m. and informed his boss that the front door was broken, a window was broken, and that he could see blood on the floor and a girl lying on the floor. The police were called to the scene and discovered H.G. lying dead on the floor with a gunshot wound to her head. They found Fairley in the bathroom, sitting on the toilet with what appeared to be a self-inflicted gunshot wound to the head. The bullet had entered under his chin and exited the top of his head. Miraculously, Fairley was still alive. Fairley was transported to a local hospital then taken to Wishard Hospital in Indianapolis.

*B. The Investigation*

[6]  Detective Jack Spencer ("Detective Spencer") of the Evansville Police Department was lead investigator on the case. He, along with crime scene investigators, spent many hours going over the scene of the crime. They also learned that Jones had reported vandalism to her vehicle outside Fairley's house the morning of the day H.G. was found dead. The police transported Jones from her home across the Ohio River in Owensboro, Kentucky and interviewed her. Jones told them of the events of the night as recounted above.

[7]  During the investigation, the police found no evidence indicating the involvement of a third party in the shootings. Forensic evidence also ruled out the possibility of an accidental shooting, as H.G.'s body had no indication that she had held the gun. Instead, the police believed that Fairley and H.G. had gotten into an argument, that Fairley had shot H.G. in the head, and then shot himself.

[8] On July 13, 2010, Detective Spencer and Detective Michael Sides ("Detective Sides") drove to Wishard Hospital to talk to Fairley. Although the police did not read Fairley his Miranda rights, Fairley was not communicative. Detective Spencer told Fairley that he would be charged with murder but did not arrest Fairley at the time.

[9] That Fairley was non-communicative was not a surprise, as he had suffered a severe head wound and a brain injury. Fairley had to undergo several surgeries and medical procedures, including a frontal lobectomy, the removal of his left eye, and repair to his skull and jaw. Fairley was also sedated for a long period. But he began to receive physical and speech therapy in July 2010 and began to stabilize. Reports from mid-July indicate that Fairley suffered from somnolence. And a clinical specialist diagnosed Fairley in mid-July with dementia, disorientation as to place, and an inability to recall the names of family members and identify objects in the room. Later that month, Fairley was given a mental acuity test in which 30 is a perfect score; Fairley scored only 12. Fairley had difficulty following instructions and could not recall some of his own personal information, e.g., he could recall his date of birth, but not his age.

[10] Indianapolis police contacted Detective Spencer in late July and informed him that the hospital was preparing to release Fairley. Detective Spencer spoke with one of Fairley's nurses, who informed him that Fairley had progressed mentally and physically but still suffered from problems with his memory. On August 2, 2010, Detectives Spencer and Sides drove to Indianapolis to take Fairley into custody and return him to Evansville. At the hospital, Detective Spencer asked

Fairley where he was, what the date was, what was his date of birth, and who was the President of the United States. Fairley answered the questions about his whereabouts correctly. Although he could not remember the name of the current President, he did recall that he was African-American. When Detective Spencer asked Fairley if he knew why he was in the hospital, he replied that he did not. But Fairley then pointed to the wound on his chin and asked when it had occurred. Detective Spencer replied that he had hoped that Fairley could tell him about the gunshot wound. Detective Spencer also asked Fairley if he knew where H.G. was. Fairley responded that he thought she was in Evansville, but knew that he had not heard from her while in the hospital.

[11] Detective Spencer's questioning of Fairley was summarized in his police report as follows:

> I asked Fairley if he remembered the night [H.G.] came to his house while Summer Jones was there and he stated he did. Fairley stated that he and Summer were about to have sex when [H.G.] came over. Fairley stated he remembered that [H.G.] broke the window and eventually came in through the front door. Fairley told me that [H.G.] had a key to his house. Fairley stated that he told Summer to leave out the back door and also told [H.G.] to leave. Fairley stated that [H.G.] was angry because Summer was there and he thought she was going to beat up Summer. Fairley stated he held [H.G.] down on the floor so Summer could leave. Fairley stated he did not know what door she left out of. Fairley stated he could not remember anything after that. I told Fairley that [H.G.] had been shot and was dead. Fairley looked at me puzzled and told me that he had just seen her recently. I told Fairley that we believed based on evidence at the scene that he had shot [H.G.] and then shot himself and I

needed to know why. Fairley stated he could not remember and never stated he did not shoot [H.G.] or himself.

Fairley was discharged and Det. Sides and I handcuffed Fairley and explained that he was under arrest for [H.G.]'s murder, and he was going back to Evansville with us. He stated he understood, but asked no questions of me. I asked no more questions of Fairley regarding the case until we left the hospital.

We stopped south of Terre Haute to get gas, and I took the opportunity to continue my questioning of Fairley. I retrieved two copies of the Miranda Waiver form and put one in his hand. I sat next to Fairley in the back seat and explained Miranda to him. He stated he understood what was said. I slowly read the form out loud and Fairley stated he understood his rights. He was unable to sign, due to the fact he was handcuffed to a leather belly belt, limiting his mobility.

I again went over the events of June 24, 2010 with Fairley, and it was digitally recorded. I showed a crime scene photo to Fairley of the front of the house and asked him if it looked familiar. He stated that it was his house. I showed another photo of a handgun lying on the carpet in a pool of blood. Fairley seemed taken back by the photo and stated that it was his gun. I asked Fairley about his relationship with [H.G.] and he stated he did not remember how they met, but they had been in a sexual relationship for at least a year. Fairley stated that Jeff Phillips and [H.G.]'s aunt Angie knew of the relationship and [H.G.] would come to his house often while she was supposed to staying at Angie's house. Fairley stated he thought [H.G.] was nineteen years old. I asked Fairley if anyone else was with [H.G.] when she came to his house that night Summer was there. He stated [H.G.] was alone, and he and Summer were alone until [H.G.] arrived. I asked Fairley if he saw [H.G.] with any weapon and he stated no. I asked Fairley if he had a sword collection and he stated he did. I asked him if he ever saw [H.G.] with one of his swords that night and he stated he did not remember her with one.

I asked Fairley about his gun and what type it was. He stated he believed it was a 9mm and he had bought it from Tony Mattingly some time ago. I asked him low long ago and he stated it probably was longer than one year. I asked Fairley where he kept his gun, and he stated that it was kept in a locked closet in his bedroom and he had the only key, which was kept on his keyring. Fairley stated he kept a loaded magazine in the gun, but not one in the chamber. I asked Fairley if [H.G.] knew he had a gun and he stated she did, but did not have access to it.

Ex. Vol., Petitioner's Ex. 10, pp. 110–111. Detective Spencer later stated that, during this interview, Fairley had provided him with little information that he did not already know. On August 4, 2010, the State charged Fairley with murder.

In jail, Fairley's recovery continued. On August 5, 2010, he asked a jail officer if he could "go sweep," which he did not understand. Tr. pp. 77–78. Eventually, he understood that Fairley meant that he wanted to shower. Approximately one week later, a clinical social worker evaluated Fairley as part of the suicide watch procedure and noted that he was oriented as to the time and date. Fairley told the social worker that he did not recall shooting himself or H.G.

*C. The Defense*

The trial court held an initial hearing on August 6, 2010, and appointed a public defender, Dennis Vowels ("Vowels"), to represent the indigent Fairley. At the time of his appointment, Vowels had been practicing law for twenty-five years and had been a public defender in Vanderburgh County for twenty-one years.

He had represented clients in forty-eight murder cases, which included four death-penalty cases and two life-without-parole cases. During Vowels's first meeting with Fairley, he was non-communicative. Vowels reviewed the large number of reports from Wishard Hospital, which revealed the extent of Fairley's injuries and his neurological problems. Vowels decided not to request the appointment of an expert to evaluate Fairley for competency; instead, he decided to wait and see if and how Fairley's condition improved. Vowels was confident, based on his extensive experience in Vanderburgh County courts, that he could continue the trial date if necessary.

[14] When the social worker reevaluated Fairley in September 2010, she determined that Fairley was functioning "generally within normal limits," though he still did not recall the shooting. Tr. pp. 77–78. Vowels met with Fairley numerous times and, by November 2010, Fairley was able to communicate with Vowels. Fairley understood the discovery materials he reviewed with Fairley and discussed his defense options. Fairley asked questions about the charges and the evidence and assisted Vowels in preparing his case.

[15] Vowels also interviewed potential witnesses and Fairley's coworkers. When he spoke with the coworkers, Vowels learned that "what was happening at Mr. Fairley's house . . . was not a positive thing." *Id*. at 14. Specifically, the coworker informed Vowels that H.G. and her other high school friends used Fairley's house as a place to meet and drink alcohol and smoke marijuana. With regard to Fairley's statement to the police, Vowels was very confident that the statement to the police would be suppressed, as there was strong evidence

that Fairley was not able to knowingly waive his *Miranda* rights at the time he made the statement. Vowels did not file a motion to suppress because his practice was to file such motions the week prior to trial. Vowels explained that he did not file motions to suppress unless he was convinced they were merited, and he had a record of success with such motions because of this.

[16] When Vowels spoke to Fairley, he noted that Fairley had an emotionally appropriate response to the events. That is, he did not make light of the situation and was solemn about the events that had occurred. Fairley was also "equivocal" about the potential defenses that were discussed and was equivocal about taking the case to trial. Tr. p. 26. Fairley eventually asked Vowels about pleading guilty, which Vowels had previously discussed with him, among other defense options. Among the other options was self-defense and arguing for a lesser included offense, in light of H.G.'s entry into Fairley's home. Vowels recalled, however, that there was no forensic evidence that H.G. had held the gun when it fired, as there was no gunpowder residue on her hands. Nor was there any tissue or blood on her hands, and the location of the wound to her head made it unlikely that it was self-inflicted. As Vowels later recalled:

> [I]t could have been played out a number different ways where she shot him and then shot herself, where she shot herself and then he was so distraught he shot himself, it could have been played a number of different ways. It was a defensible case.

*Id*. at 25.

*D. The Plea*

[17] Eventually, Fairley decided that he wanted to plead guilty to "the best deal [Vowels] could get." Tr. p. 27. Vowels did not think that the State based its position on the admission of Fairley's statement to the police. In fact, he believed that the prosecutor "probably figured out that he wasn't going to get [the statement] into evidence either." *Id.* at 29. Vowels testified that the statement and its admissibility did not affect the plea negotiations. Ultimately, Vowels negotiated a plea agreement wherein Fairly would plead guilty to murder and receive a fifty-year executed sentence, which he stated was the best deal he could get from the prosecutor. Fairley agreed to plead guilty pursuant to these terms.

[18] At the plea hearing, the trial court engaged in an extended colloquy with Fairley regarding his plead:

| [Court]: | You've been charged in this case with Murder a felony. You understand the nature of that charge? |
| --- | --- |
| [Fairley]: | Yes Sir, I do. |
| [Court]: | Pursuant to this plea agreement you now withdraw you[r] plea of not guilty and enter a plea of guilty as charged. |
| [Fairley]: | Yes. |
| [Court]: | You understand that by you[r] plea of guilty you are admitting the truth of all the facts [as] alleged in the charging information filed against you and upon entry of you[r] plea of guilty the Court will proceed with judgment and sentencing. |
| [Fairley]: | Yes Sir. |

[Court]:      You understand the following rights, you are entitled to a speedy and public trial by court or jury the State must prove beyond a reasonable doubt that you committed the offense charged before you can be convicted of it. You have the right to introduce evidence and testify if you so desire. However, you cannot be compelled to testify against yourself. The court will subpoena any witnesses needed for your defense. You have the right to object to the introduction of the evidence and to confront and cross examine any witness used by the State. If the verdict is against you and you were found guilty you have the right to appeal. If you could not afford an attorney the court would appoint an attorney to represent you on that appeal. Do you understand these rights?

[Fairley]:    Yes.

[Court]:      You also understand Sir by pleading guilty you're giving up all these rights.

[Fairley]:    Yes.

[Court]:      Now [the] State says that in Vanderburgh County, Indiana on or . . . between June 23 and June 24 of 2010 you knowingly and intentionally killed another human being. That being, [H.G.]. Do you admit that Sir?

[Fairley]:    Yes. Sir.

[Court]:      [Is the] State satisfied with [the] factual basis?

[State]:      Yes, Your Honor.

[Court]:      Have you read this plea agreement, Mr. Fairley?

[Fairley]:    Yes.

[Court]:      Does it contain all the conditions reached between yourself and the State of Indiana?

[Fairley]:    Yes.

| | |
|---|---|
| [Court]: | You understand that I am not a party to this agreement and that I've neither accepted it or rejected it at this time. |
| [Fairley]: | Yes. |
| [Court]: | You understand that if I don't accept the agreement you'll be . . . permitted to withdraw you[r] plea of guilty and re-enter [a plea] of not guilty and then these proceedings today will not be made a matter of record. And if I accept the agreement I'm bound by the terms of the agreement as well. Do you understand that? |
| [Fairley]: | Yes Sir. |
| [Court]: | Are you aware that the maximum sentence for the charge of Murder is sixty five (65) years, minimum of forty five (45) years with a possible fine up to ten thousand (10,000) dollars. |
| [Fairley]: | Yes. |
| [Court]: | If this crime [was] committed while you were on probation, parole or serving a prison term for another crime then the sentence for this crime cannot begin until the other has ended. This is called consecutive sentences, do you understand that? |
| [Fairley]: | Yes Sir. |
| [Court]: | Has anyone made any promises[,] force or threats to obtain your plea of guilty? |
| [Fairley]: | No Sir. |
| [Court]: | Therefore is it a voluntary plea of guilty? |
| [Fairley]: | Yes. |
| [Court]: | Do you fully understand this proceeding Sir, and have you discussed it with you[r] attorney? |
| [Fairley]: | I did. Yes. |

| [Court]: | Are you presently under the influence of alcohol or drugs? |
|---|---|
| [Fairley]: | No. |
| [Court]: | You understand that before you're sentenced, you'll have the right to present evidence or testimony or have you're [sic] attorney speak on you[r] behalf? |
| [Fairley]: | I understand. |
| [Court]: | If you understand those rights Sir, please sign that form and file it with the court. Please let the record reflect he's been advised of his constitutional rights and he has filed the acknowledgment of those rights. The Court finds that a factual [basis] exists for his plea of guilty to Murder [a] Felony. Court further finds the defendants plea is made knowingly, voluntarily and intelligently. Court orders a pre-sentence investigation report to be prepared[.] |
| [Vowels]: | [O]ne of the things that wasn't asked [of] you, do you understand if you went to trial the way the evidence is in this case that I believe the Jury would get a verdict form and they could choose between finding you guilty of Murder or Manslaughter or Reckless Homicide. And those sentences are a lot less than this. It's less than fifty (50) years that you're agreeing to, and by pleading guilty you don't give a jury the opportunity to decide if you committed a lesser charge. You understand what I've said? |
| [Fairley]: | Yes Sir. |
| [Vowels]: | You, you wanna do this? You wanna plead guilty to Murder and take fifty (50) years if the Judge will give it to ya? |
| [Fairley]: | Yes, I do. |

Ex. Vol., Petitioner's Ex. 2, pp. 2–6. The trial court then accepted the plea.

[19] The presentence investigation report ("PSI") noted that Fairley had two juvenile adjudications, one for an unknown reason and one for what would have been possession of stolen property if committed by an adult. Fairley had been charged with two prior crimes, both misdemeanor possession of marijuana; one of these was dismissed, and Fairley was convicted of the other. In the PSI Fairley gave a version of the events of the crime in which H.G. got his gun, he and H.G. struggled over the gun, and the gun discharged, hitting H.G. in the head. Fairley explained that he shot himself because he felt badly about what had happened. *Id.*, Petitioner's Ex. 5. p. 5. This, of course, differed from Fairley's previous statements in which he claimed to be unable to remember the events of the shooting.

[20] On March 17, 2011, the trial court held a sentencing hearing. Fairley stated that he was "sorry for what did happen." *Id.* Petitioner's Ex. 3, p. 2. H.G.'s mother testified at the hearing and expressed her anger at Fairley. She also suggested that the plea agreement indicated that the State had something to hide:

> A trial would have meant that all of the facts of the case would be exposed. There are certain facts the State hopes never does. One day everything will come out from Officer Doolittle's actions or lack thereof that are detrimental to the reputation of the police department. One day [H.G.]'s storey [sic] will be told. . . .

*Id.* at 4. When pronouncing its sentence, the trial court addressed the comments made by H.G.'s mother:

> I'd like to address the comments made by uh...the victim's mother. [A]nyone that has children knows . . . that a parent's

worst nightmare is to lose a child. We all know that and almost all of us in here have children including the lawyers. [A]nd so, and so I understand your grief. [B]ut I would like to point out a few things. First of all, the amount of years that Mr. Fairley gets for his crime . . . does not measure the value of your child's life[.] Secondly, this man's pleading guilty as charged to the crime of Murder. . . . I've looked at the file. I've looked at the charges. I've looked at the facts and it's my judgment that it is a very fair plea on both sides, especially from the State. *I think there's a very real chance that if this case had gone to trial that it could have been a conviction for something less, whether people agree with that or not.* Lastly, I want to say that there are no more competent or ethical attorneys that practice before this court then [sic] the gentleman . . . that sit[] here today. . . . None of these gentlemen are either liars nor are they manipulator's [sic] and . . . I regret that those words were said. . . . I know these people and their [sic] good people and good lawyers.

*Id.* at 5 (emphasis added). Pursuant to the plea agreement, the trial court sentenced Fairley to fifty years of incarceration.

*E. Post-Conviction Proceedings*

On February 23, 2012, Fairley filed a pro se petition for post-conviction relief. The State Public Defender's office entered an appearance on Fairley's behalf the following month, and an amended petition for post-conviction relief was filed on April 29, 2016. After the State filed its answer, the post-conviction court held an evidentiary hearing on the petition on July 26, 2016. Fairley called as witnesses Vowels, Detective Spencer, Detective Sides, and Dr. Fred Unverzagt ("Dr. Unverzagt"), a neuropsychologist who testified that Fairley would not have been mentally competent to waive his Miranda rights at the

time of his statement to the police. At the conclusion of the hearing, the post-conviction court left the evidence open, and Fairley later submitted to the court the deposition of Dave Frank, Fairley's former employer, and the audio recording of Fairley's August 2, 2010 statement to the police. On February 21, 2017, the post-conviction court issued findings of fact and conclusions of law denying Fairley's petition. Fairley now appeals.

## Standard of Review

Post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. *McCary v. State*, 761 N.E.2d 389, 391 (Ind. 2002). Post-conviction proceedings instead afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Henley v. State*, 881 N.E.2d 639, 643 (Ind. 2008). Thus, on appeal from the denial of a petition for post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 643–44. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings under a clearly erroneous standard. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Accordingly, we will not

reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id.*

## I. Ineffective Assistance of Trial Counsel

[23] Fairley claims his trial counsel was ineffective for failing to investigate Fairley's competence to plead guilty and for failing to file a motion to suppress Fairley's statement to the police. Our supreme court has summarized the law regarding claims of ineffective assistance of appellate counsel as follows:

> When evaluating an ineffective assistance of counsel claim, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009). To satisfy the first prong, "the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002) (citing *Strickland*, 466 U.S. at 687–88). To satisfy the second prong, "the defendant must show prejudice: a reasonable probability (i.e. a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694).

*Campbell v. State*, 19 N.E.3d 271, 274 (Ind. 2014). Moreover,

> There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review. Isolated mistakes,

poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Stevens v. State*, 770 N.E.2d 739, 746–47 (Ind. 2002) (citations omitted).

[24] Claims of ineffective assistance of trial counsel following a guilty plea require certain other considerations. With regard to guilty pleas, two general types of claims of ineffective assistance of trial counsel are accepted: (1) the failure to advise the defendant on an issue that impairs or overlooks a defense, and (2) an incorrect advisement of penal consequences. *Manzano v. State*, 12 N.E.3d 321, 326 (Ind. Ct. App. 2014), *trans. denied* (citing *Segura v. State*, 749 N.E.2d 496, 500 (Ind. 2001)).

[25] In *Segura*, our supreme court explained what a petitioner must establish on a claim of ineffective assistance of trial counsel following a guilty plea:

> We conclude that *Hill* [*v. Lockhart*, 474 U.S. 52 (1985)] . . . requires a showing of a reasonable probability of success at trial if the alleged error is one that would have affected a defense. This result seems preferable for several reasons. In [*State v.*] *Van Cleave*, [674 N.E.2d 1293 (Ind. 1996),] we identified sound reasons for requiring that a petitioner who pleads guilty show a reasonable probability of acquittal in order to prevail in a post-conviction attack on the conviction based on a claim of ineffective assistance of counsel. As *Hill* emphasized, the State has an interest in the finality of guilty pleas. This is in part grounded in the cost of a new trial, and the demands on judicial resources that are imposed by revisiting the guilty plea, but also in concerns about the toll a retrial exacts from victims and witnesses who are required to revisit the crime years later.

*Segura*, 749 N.E.2d at 503 (citations omitted). Our supreme court therefore concluded that "[a] new trial is of course necessary if an unreliable plea has been accepted. But its costs should not be imposed needlessly, and that would be the result if the petitioner cannot show a reasonable probability that the ultimate result-conviction-would not have occurred despite counsel's error as to a defense." *Id*. Thus, under *Segura*, to be successful in his claim of ineffective assistance of trial counsel alleging an error that affects a defense, the petitioner must prove that, but for counsel's alleged errors, he would not have been convicted. *See id*.

[26]     In contrast, if the allegation of trial counsel error is in advice as to penal consequences, *Segura* requires a petitioner to "establish, by objective facts, circumstances that support the conclusion that counsel's errors in advice as to penal consequences were material to his or her decision to plead." *Willoughby v. State*, 792 N.E.2d 560, 564 (Ind. Ct. App. 2003) (citing *Segura,* 749 N.E.2d at 507), *trans. denied*.[2]  Here, Fairley's claims of trial counsel's performance appear to fall into the first *Segura* category.

_____

[2]  We have noted before that the federal Seventh Circuit Court of Appeals disagreed with the Segura holding and concluded that our supreme court misinterpreted the United States Supreme Court's holding in *Hill. See Manzano v. State*, 12 N.E.3d 321, 326 n.1 (Ind. Ct. App. 2014), *trans. denied* (citing *Payne v. Brown*, 662 F.3d 825, 828 (7th Cir. 2011)). But because the Seventh Circuit's "decisions on questions of federal law are not binding on state courts," *Jackson v. State*, 830 N.E.2d 920, 921 (Ind. Ct. App. 2005), we have continued to follow *Segura*.

Earlier this year, the United States Supreme Court decided *Lee v. United States*, ___ U.S. ___, 137 S. Ct. 1958 (2017). In *Lee*, the Court acknowledged that, "when the defendant's decision about going to trial turns on his prospects of success and those are affected by the attorney's error—for instance, where a defendant alleges that his lawyer should have but did not seek to suppress an improperly obtained confession," then the defendant must also show that he would have been better off going to trial. *Id*. at 1965. This is similar to what

*A. Failure to Investigate Competence*

Fairley argues that his trial counsel, Vowels, was ineffective for failing to investigate his competence to proceed in the criminal case against him and to plead guilty. Fairley contends that, had his counsel investigated his competency, he would have learned of the devastating impact of his brain injury, the proceedings would have been stayed, and Fairley would not have pleaded guilty.

A defendant is not competent to stand trial when he is unable to understand the proceedings and assist in the preparation of his defense. *Mast v. State*, 914 N.E.2d 851, 856 (Ind. Ct. App. 2009), *trans. denied*. The conviction of an incompetent defendant is a denial of both federal due process and a denial of a state statutory right. *Faris v. State*, 901 N.E.2d 1123, 1125 (Ind. Ct. App. 2009), *trans. denied*. When a criminal defendant is thought to lack the ability to understand court proceedings and assist in his own defense, the trial court

---

our supreme court held in *Segura* with regard to claims that affect or impair a defense. But the *Lee* Court noted that not all allegations of deficient performance are of this sort. *Id.* For example, the allegation of deficient performance in *Lee* was one that affected the defendant's understanding of the consequences of pleading guilty, i.e., deportation. *Id.* This is akin to the "penal consequences" category mentioned in *Segura*. *See* 749 N.E.2d at 500. The *Lee* Court declined to adopt a per se rule that a defendant with no viable defense cannot show prejudice from the denial of his right to trial under such circumstances. *Id.* at 1966. Instead, *Lee* held that even a defendant without a viable defense can still show prejudice if he can show that, but for counsel's errors, he would have gone to trial. *Id.* at 1966. "When th[e] consequences [of pleading guilty] are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive." *Id.* at 1966 (citation omitted).

Whether *Segura* conflicts with *Lee* is a question we need not resolve in the present case, because Fairley did not establish the first prong of the *Strickland* test, i.e., that his counsel's performance fell below an objective standard of reasonableness.

should set a hearing and appoint two or three disinterested psychiatrists or psychologists to evaluate the competency of the defendant. *Gross v. State*, 41 N.E.3d 1043, 1047 (Ind. Ct. App. 2015) (citing Ind. Code § 35-36-3-1(a)). If, following the hearing at which evidence pertaining to the defendant's competency is presented, the trial court determines that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense, the trial will be delayed while the defendant is committed to the Division of Mental Health and Addiction, which "'shall provide competency restoration services or enter into a contract for the provision of competency restoration services by a third party[.]'" *Id*. (quoting Ind. Code § 35-36-3-1(b)).

[29] Here, the evidence Fairley presented at the post-conviction hearing did not lead unerringly and unmistakably to a conclusion that his trial counsel's performance in this regard fell below an objective standard of reasonableness with regard to investigating Fairley's competence. Vowels testified that when he first met with Fairley, he seemed non-communicative. However, Fairley made a rapid recovery, and soon began to respond appropriately to Vowels's questions about the charges against him. Fairley was eventually able to recall the events that led up to the shooting, up to the moment when Jones left the house while he restrained H.G. Fairley was able to go over the discovery materials with Vowels and discussed possible defenses and the evidence against him. Vowels specifically testified that Fairley was able to consult with him in a meaningful way and was able to assist Vowels in preparing his defense. True, Fairley still had certain memory deficiencies, but the fact that Fairley could not

recall the moments around the shooting does not mean that he was incompetent to stand trial.

[30] Moreover, the testimony of Fairley's expert witness, Dr. Unverzagt, went mostly to his mental state at the time of the statement to the police. Indeed, Fairley admits that Dr. Unverzagt was unable to do a "retroactive" competency analysis of Fairley at the time of the plea hearing. Dr. Unverzagt admitted that Fairley had a remarkable recovery and that he was unable to assess Fairley's mental functioning at the time of the plea hearing. Under these facts and circumstances, the post-conviction court did not clearly err in determining that Vowels's decision not to investigate Fairley's competence further or seek a competency hearing did not fall below an objective standard of reasonableness.[3]

### B. Failure to File a Motion to Suppress

[31] Fairley also argues that his trial counsel was ineffective for failing to file a motion to suppress his statement to the police on grounds that he was mentally

---

[3] Fairley claims that attorney Vowels has made a similar mistake in the past, noting that he was the trial counsel in *Prowell v. State*, 741 N.E.2d 704 (Ind. 2001), a case in which our supreme court reversed the post-conviction court's finding that Vowels provided effective assistance. But in that case, Vowels's performance was deficient because he failed to timely retain experts for mitigation in a death penalty prosecution, relying instead on the "good graces" of the particular trial court judge. *Id*. at 715, 718. Moreover, the fact that Vowels was ineffective in his representation in a case that occurred in 1993 and 1994, over twenty years ago, is not terribly probative of Vowels's performance in the present case.

We also find *Mast v. State*, 914 N.E.2d 851 (Ind. Ct. App. 2009), *trans. denied*, to be distinguishable from this case. In *Mast*, trial counsel requested mental health evaluations of his client. One evaluation concluded that Mast was incompetent to stand trial, and the other expressed uncertainty about Mast's competency. Yet his trial counsel did not ensure that these evaluations were brought to the attention of the trial court. *Id*. at 857. This is why the majority in *Mast* concluded that counsel was ineffective. Here, in contrast, the evidence supporting the post-conviction court's decision reveals that, although Vowels initially felt that Fairley was non-communicative, Fairley rapidly improved and was able to assist in his defense.

incapable of knowingly waiving his Miranda rights at the time of the police interview, when Fairley was still relatively non-communicative.

[32] Vowels explained that he had not yet filed a motion to suppress because he usually did not do so until closer to trial. He was confident that the statement would not be admitted into evidence and believed that the prosecuting attorney also believed that the statement would not be admissible. Thus, he felt that the statement, and his not having yet filed a motion to suppress, did not affect the plea negotiations between Fairley and the State. Although Fairley now claims that his negotiation position could have only been helped had Fairley filed a motion to suppress and successfully excluded the statement, this is contrary to Vowels's testimony. Vowels is an experienced defense attorney in Vanderburgh County, and the post-conviction court was in a better position to judge the veracity of his claim than we are on appeal. Accordingly, the post-conviction court did not clearly err in concluding that Fairley's trial counsel was not ineffective.

## II. Voluntariness of Guilty Plea

[33] Fairley also claims that the post-conviction court erred in rejecting his claim that his plea of guilty was not knowingly and voluntarily made. The test for the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. *Williams v. State*, 42 N.E.3d 107, 113 (Ind. Ct. App. 2015), *trans. denied.* Accordingly, Indiana Code section 35-35-1-2 provides that a trial court accepting a guilty plea must determine that the defendant, among other things: (1) understands the

nature of the charges; (2) has been informed that a guilty plea effectively waives several constitutional rights—including trial by jury, confrontation and cross-examination of witnesses, compulsory process, and proof of guilt beyond a reasonable doubt without self-incrimination; and (3) has been informed of the maximum and minimum sentences for the crimes charged. In assessing the voluntariness of the plea, we review all the evidence before the post-conviction court, including testimony given at the post-conviction trial, the transcript of the petitioner's original sentencing, and any plea agreements or other exhibits that are part of the record. *Williams*, 42 N.E.3d at 113.

[34]  A guilty plea entered after the trial court has reviewed the various rights that a defendant is waiving and has made the inquiries called for by statute is unlikely to be found wanting in a collateral attack. *Cornelious v. State*, 846 N.E.2d 354, 357 (Ind. Ct. App. 2006) (citing *State v. Moore*, 678 N.E.2d 1258, 1265 (Ind. 1997)), *trans. denied*. To present a colorable claim for relief under such circumstances, a defendant can show that he was coerced or misled into pleading guilty by the judge, prosecutor, or his own defense counsel. *Id*.

[35]  Fairley argues that his traumatic brain injury affected his ability to remember the events of the shooting and that his plea was therefore involuntary. We disagree. The trial court explained all of the rights Fairley would give up if he pleaded guilty. Despite these warnings, Fairley never indicated anything other than a desire to plead guilty at the plea hearing. To the contrary, he informed the trial court that he understood the nature of the charge against him, and that he admitted to the truth of the allegations contained in the charging

information. Vowels even explained to Fairley on the record the possibility of him being convicted of a lesser-included offense if he proceeded to trial. Fairley indicated that he understood this but still desired to plead guilty. And Vowels testified at the post-conviction hearing that he observed nothing about Fairley's demeanor or behavior at the plea hearing that would have indicated that Fairley was incompetent to plead guilty. Simply put, the post-conviction court did not clearly err in concluding that Fairley had not met his burden of proof to show that he was incompetent to plead guilty.

[36] Fairley also contends that his guilty plea was faulty because there was an insufficient factual basis to support the plea. Indiana Code section 35-35-1-3(b) provides that a trial court "shall not enter judgment upon a plea of guilty unless it is satisfied from its examination of the defendant or the evidence presented that there is a factual basis for the plea." The factual basis requirement primarily ensures that when a plea is accepted there is sufficient evidence that a court can conclude that the defendant could have been convicted had he stood trial. *Oliver v. State*, 843 N.E.2d 581, 588 (Ind. Ct. App. 2006), *trans. denied*. A finding of factual basis is a subjective determination that permits a court wide discretion which is essential due to the varying degrees and kinds of inquiries required by different circumstances. *Id*. A factual basis exists when there is evidence about the elements of the crime from which a court could reasonably conclude that the defendant is guilty. *Id*. We typically review claims of error about pleas under an abuse of discretion standard. *Id*. This standard is also appropriate where, as here, a post-conviction petitioner asks that his plea be set

aside through a motion for post-conviction relief on grounds that the factual basis was inadequate. *Id.*

[37] Indiana courts have recognized four methods for eliciting evidence to prove a factual basis to support a guilty plea: (1) by the State's presentation of evidence on the elements of the charged offenses; (2) by the defendant's sworn testimony regarding the events underlying the charges; (3) by the defendant's admission of the truth of the allegations in the charging information read in court; or (4) by the defendant's acknowledgment that he understands the nature of the offenses charged and that his plea is an admission of the charges. *Id.*; *see also Ellis v. State*, 67 N.E.3d 643, 647 (Ind. 2017) (setting forth the four methods by which a factual basis to support a guilty plea may be established). Here, the allegations set forth in the charging information were read in open court, and Fairley admitted to the truth of the allegations. This was sufficient to establish the factual basis for his guilty plea. *See Oliver*, 843 N.E.2d at 588; *Ellis*, 67 N.E.3d at 647.

[38] Still, Fairley argues that his subsequent statement in the pre-sentence investigation report, wherein he claimed that the gun went off as he and H.G. struggled for control of the weapon, undermines the factual basis for his plea. Our supreme court has rejected similar claims in the past. *See Moredock v. State*, 540 N.E.2d 1230, 1231 (Ind. 1989) (holding that post-conviction petitioner's protestations of innocence in his pre-sentence investigation report after he pleaded guilty were not an adequate basis for post-conviction relief); *see also Mayberry v. State*, 542 N.E.2d 1359, 1361 (Ind. Ct. App. 1989) (citing *Moredock*

in holding that post-conviction petitioner's claims of innocence in unsworn pre-sentence investigation report was insufficient to establish grounds for post-conviction relief where trial court had already accepted plea of guilty), *trans. denied*; *Hatcher v. State*, 523 N.E.2d 446, 447 (Ind. Ct. App. 1988), *adopted and aff'd*, 540 N.E.2d 1241 (Ind. 1989) (holding that post-conviction petitioner had not established grounds for relief where defendant had pleaded guilty without maintaining innocence then later claimed to be innocent in unsworn pre-sentence investigation report).

[39] Fairley claims that his case is distinguishable from these cases because of his brain injury and what he claims to be the limited nature of the trial court's inquiry at the plea hearing. We disagree. These cases clearly hold that a protestation of innocence made in an unsworn pre-sentence investigation report *after* a defendant has pleaded guilty do not affect the validity of the plea. The same is true here. It was only after he pleaded guilty that Fairley made the unsworn statement in the pre-sentence investigation report claiming that the gun went off accidentally as he struggled with H.G. for control of the weapon. Moreover, his own expert, Dr. Unverzagt, explained that this version of events could have been Fairley merely repeating a version of events that had been described to him during the plea negotiations, as opposed to his own actual recollection of events. Ex. Vol., Petitioner's Ex. 12, pp. 11–12.

[40] Accordingly, we conclude that Fairly has not established that the post-conviction court clearly erred in rejecting his claim that his guilty plea was not knowingly and voluntarily made.

## III. Denial of Due Process

[41] Lastly, Fairley claims that he was denied due process of law when the trial court accepted his guilty plea when the trial court did not *sua sponte* investigate whether Fairley was competent to stand trial. He argues that, given the nature of his injuries, the trial court should have ordered a competency evaluation and that, had the trial court done so, he would have been found to be incompetent to plead guilty.

[42] Notably, Fairley does not bring this claim under the rubric of a claim of ineffective assistance of trial counsel, nor is it part of his claim that his plea was not knowingly or voluntarily made. Instead, it appears to be a free-standing claim of error. More specifically, it appears to be a claim of fundamental error, as he argues that the trial court should have acted *sua sponte*. *See Taylor v. State*, No. 82S00-1610-LW-576, ___ N.E.3d ___, 2017 WL 6014364, at *3 (Ind. Dec. 5, 2017) (noting that to show fundamental error, a defendant must establish that the trial court should have raised an issue *sua sponte* due to a "blatant violation of basic and elementary principles, undeniable harm or potential for harm, and prejudice that makes a fair trial impossible."). But claims of fundamental error are not available in post-conviction proceedings. *Sanders v. State*, 765 N.E.2d 591, 592 (Ind. 2002). Thus, to the extent that Fairley's claim is one of fundamental error, we are unable to review it. *See id*.

[43] Even if we addressed Fairley's claim on its merits, he would not prevail. Fairley indisputably suffered from a traumatic brain injury. And he was initially non-communicative and therefore presumably unable to assist his counsel in his

defense. However, Fairley made a remarkable recovery, and Vowels, his extremely experienced trial counsel, was able to communicate with him and discuss the charges against him and the available defenses. Indeed, Vowels testified at the post-conviction hearing that there was no indication that Fairley was incompetent at the time he chose to plead guilty. Although Fairley had a visible injury from his failed suicide attempt, he was able to communicate and understand what was going on. More importantly, Vowels testified that Fairley was competent and desired to plead guilty. The trial court thoroughly explained the rights Fairley would forgo by pleading guilty, and Fairley indicated that he understood his rights yet still desired to plead guilty. Vowels even questioned Fairley on the record to ensure that Fairley understood that he was forgoing the possibility of being convicted for a lesser included offense. Still, Fairley indicated that he understood this and wanted to plead guilty. Under these facts and circumstances, we are unable to say that Fairley was so obviously impaired that the trial court should have ordered a competency evaluation *sua sponte* and that the trial court's failure to do so amounted to a deprivation of due process.

## Conclusion

[44] The post-conviction court did not clearly err in concluding that Fairley had not met his burden of establishing that his trial counsel was ineffective for failing to have Fairley's competency evaluated or for failing to move to suppress Fairley's statement to the police. Nor did the post-conviction court clearly err in rejecting Fairley's claim that his guilty plea was not made knowingly and voluntarily. Lastly, the post-conviction court did not clearly err in determining that Fairley

was not deprived due process when the trial court did not *sua sponte* order Fairley to undergo a competency evaluation. Accordingly, we affirm the order of the post-conviction court denying Fairley's petition for post-conviction relief.

[45] Affirmed.

Vaidik, C.J., and Crone, J., concur.